**AMERICAN CIVIL LIBERTIES UNION OF MISSISSIPPI, INC. et al., Plaintiffs–Appellees,**

v.

**STATE OF MISSISSIPPI, et al., Defendants,**

v.

**Edwin KING and John Salter, Plaintiffs Subclass Second–Appellants.**

No. 89–4647.

United States Court of Appeals, Fifth Circuit.

Sept. 14, 1990.

Dixon L. Pyles, Pyles & Tucker, Jackson, Miss., David B. Goldstein, Eric M. Lieberman, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York City, for plaintiff subclass second-appellants.

Shirley Payne, American Civil Liberties Union, Jackson, Miss., Ronald W. Lewis, Oxford, Miss., for plaintiff-appellees.

Before THORNBERRY, GEE, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Following the dismantling of the Mississippi State Sovereignty Commission (the "Commission"), a number of individuals and organizations brought suit against various Mississippi state officers, seeking to recover damages and to enjoin any further information-gathering activities of the type that the Commission had once directed against them. Subsequently, the district court divided this group of plaintiffs into two subclasses, one of which is now appealing the court's decision granting complete public disclosure of the information accumulated in the Commission's files.

Appellants, the "privacy plaintiffs," maintain that this complete disclosure senselessly and needlessly violates many individuals' constitutional right not to have the government publicly release sensitive personal information about them. They as-

sert that a complete public release of the information would serve only to amplify the deleterious effects of abusive and unconstitutional governmental behavior by subjecting innocent parties to spurious allegations that, whether true or false, would not have been contained within any governmental files but for unconstitutional invasions of those parties' privacy. Appellees, the "disclosure plaintiffs," argue that a limited disclosure would unconstitutionally deny access to the courts, deprive the public of important information about governmental activities, inhibit the workings of a free press, encourage government censorship, obstruct justice, impede individuals in their efforts to clear their names, and improperly impose federal remedies where state remedies are adequate and available. We vacate and remand.

## I.

Because the district court has set forth at length the factual background of this case in its published opinion, *American Civil Liberties Union ("ACLU") v. Mabus*, 719 F.Supp. 1345 (S.D.Miss.1989), we include only a brief summary of those facts. In 1956 the State of Mississippi enacted laws creating the Commission. By statute, the governor, the lieutenant governor, the attorney general, and the speaker of the state house of representatives served as four of its twelve members. Launched with the ostensibly benign purposes of "protect[ing] the sovereignty of the State of Mississippi ... from encroachment thereon by the Federal Government ... and resist[ing] the usurpation of the rights and powers reserved to this state," the Commission in actuality was the state's secret intelligence arm, committed and devoted to the perpetuation of racial segregation in Mississippi.[1]

In 1977, when the Mississippi legislature finally voted to disband the Commission, it also directed that all the records accumulated by the Commission be destroyed. Before this could be implemented, plaintiffs in this action obtained an order enjoining the destruction of the files. Thereafter, the legislature enacted legislation sealing the files until 2027.

In 1982, after we had vacated the district court's earlier denial of class certification, *see ACLU v. Finch*, 638 F.2d 1336, 1338, 1340 (5th Cir. Unit A Mar.1981), the district court granted the plaintiffs' request for class certification. In 1986, a consent judgment was entered between the plaintiff class and defendant state actors, settling much of the defendants' liability for damages and enjoining the state from further investigating or harassing individuals or groups based solely upon their exercise of protected first amendment rights.

The declaratory judgment, the disclosure orders, and attorneys' fees were left to the later district court opinion in *ACLU v. Mabus* [, 719 F.Supp. 1345 (S.D.Miss.1989) ]. This subsequent decision and order, from which the instant appeal arises, holds that Miss.Code Ann. § 39–5–63 violates the United States Constitution. The order enjoins Mississippi from enforcing the statutes that would keep the files accumulated by the Commission under seal until the year 2027 (*id.* § 39–5–61) and that make it a felony to release information from those files (*id.* § 39–5–63). On the issue relevant to this appeal, the court ordered that all Commission files be disclosed and accessible to the general public.

---

**1.** We make no statement as to the extent of the Commission's unlawful activity. We do note, though, that its intrusive reach into people's private lives was often not only surreptitious but also marked by dire consequences. For example, when informed by one white Mississippi couple that their daughter, a college student, was dating a man who they thought might be of mixed race, the Commission conducted a detailed investigation of the matter to trace the family's lineage and prepared to arrange for the young man to be drafted into the armed services should he be found to have a sufficient number of non-white ancestors. The Commission also investigated voter registration efforts with the apparent purpose of ensuring that blacks were not given assistance in completing their applications to vote; the extent of the Commission's activities in this area, though, remains largely unknown, as the Commission ordered destroyed any materials showing that it had interfered with voter registration.

## II.

The district court found that approximately three fourths of what is contained in the files is newspaper clippings or other material already in public circulation.

The other quarter of the material includes correspondence to employers urging them to fire employees who advocated desegregation, correspondence recommending the denial of commissions as notaries public for applicants who supported civil rights groups, reports of information gathered through warrantless searches on private property, lists distributed to local law enforcement agencies of people suspected of being civil rights leaders or workers, and reports of money spent to support informants, press relations and investigations.

719 F.Supp. at 1350–51. The gathering, compiling, or maintaining of many of these records was in violation of constitutional privacy rights, as many of the above activities were ones in which governments should not properly be engaged. Without deciding specifically which of the files implicate constitutional privacy interests, we consider the proper treatment of those files where a privacy interest is present.

The privacy plaintiffs have not requested, and we do not recommend, that the Commission's files remain entirely inaccessible to the public. We hold today only that on the record before us, complete and unfettered disclosure of the files does not give appropriate protection to the constitutional privacy interests of various persons in not having government-gathered sensi-

tive personal information about them released.

■ While we review *de novo* the district court's exposition of the appropriate constitutional standards and rules, we review for abuse of discretion the court's weighing of the right of access to the files against the privacy interests of those named therein.[2] Specific factual findings of the district court on the issue are, of course, entitled to review under the clearly erroneous standard.

## III.

The Supreme Court has recognized, in certain circumstances, some degree of constitutional protection for individuals from public dissemination of sensitive personal information. *See Whalen v. Roe*, 429 U.S. 589, 599, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977).[3] We described this privacy right in *Ramey v. City of Hedwig Village*, 765 F.2d 490, 492 (5th Cir.1985), *cert. denied*, 474 U.S. 1062, 106 S.Ct. 809, 88 L.Ed.2d 784 (1986):

The constitution protects individuals against invasion of their privacy by the government. The liberty interest in privacy encompasses two notions: The freedom from being required to disclose personal matters to the government and the freedom to make certain kinds of decisions without government interference. The disclosure strand of the privacy interest in turn *includes the right to be free from the government disclosing private facts about its citizens* and from the government inquiring into matters in

**2.** *See Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 598–99, 98 S.Ct. 1306, 1312–13, 55 L.Ed.2d 570 (1978) ("It is difficult to distill from the relatively few judicial decisions a comprehensive definition of what is referred to as a common-law right of access or to identify all the factors to be weighed in determining whether access is appropriate. The few cases that have recognized such a right do agree that the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case."); *see also In re Application of Newsday, Inc.,* 895 F.2d 74, 79 (2d Cir.), *cert. denied,* 110 S.Ct. 2631, 110 L.Ed.2d 651 (1990).

**3.** "The cases sometimes characterized as protecting 'privacy' have in fact involved at least two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." *Whalen v. Roe,* 429 U.S. at 598–600, 97 S.Ct. at 875–77. *See also Fadjo v. Coon,* 633 F.2d 1172, 1175 (5th Cir. Unit B Jan. 1981). "The 'zone of privacy' safeguarded by the Constitution includes 'the individual interest in avoiding disclosure of personal matters.'" *Johnson v. Department of the Treasury,* 700 F.2d 971, 976 (5th Cir.1983) (quoting *Whalen*).

which it does not have a legitimate and proper concern. [Emphasis added.]

We echo the district court in stating that the thwarting of constitutional imperatives is not a legitimate and proper concern. The Commission compiled personal information on suspected civil rights activists largely for the purpose of suppressing speech contrary in viewpoint to the beliefs of the Commission and with the primary goal of preventing any encroachment upon Mississippi's segregated educational system despite existing federal court orders declaring its demise. Moreover, some of the information not only was assembled pursuant to an unconstitutional purpose but also included unconstitutional searches and seizures. In fact, the litigants in this action do not contest the district court's finding that much of the information was collected in violation of certain individuals' first, fourth, and fourteenth amendment and constitutional privacy rights.

█ At issue here is what to do with this collection of information, most of which should never have been gathered. Thus, we consider the extent of the right to be free from the government's disclosing private facts about its citizens. Here, "where the privacy right is invoked to protect confidentiality, a balancing standard is appropriate as opposed to the compelling state interest analysis involved when autonomy of decisionmaking is at issue." *Fadjo v. Coon*, 633 F.2d at 1176. "An intrusion into the interest in avoiding disclosure of personal information will thus only be upheld when the government demonstrates a legitimate state interest which is found to outweigh the threat to the plaintiff's privacy interest." *Id.*

In *Fadjo, id.*, we also concluded that the Supreme Court, in *Whalen v. Roe* and *Nix-*

*on v. Administrator of Gen. Servs.*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), found the privacy interest in confidentiality to be extensive. In the case at bar, Commission reports include numerous instances of (often unsubstantiated) allegations of homosexuality, child molestation, illegitimate births, and sexual promiscuity, as well as reports of financial improprieties, drug abuse, and extreme political and religious views. Therefore, the privacy plaintiffs undeniably have an interest in restricting the disclosure of the information in the files; this interest must be balanced against competing disclosure interests.[4]

### A.

The disclosure plaintiffs cite *Ross v. Midwest Communications, Inc.*, 870 F.2d 271 (5th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 326, 107 L.Ed.2d 316 (1989), for the proposition that where the facts published are of "legitimate public concern," the right to publish information will overcome privacy rights. In *Ross*, we affirmed a summary judgment refusing to hold a radio station liable for publishing sensitive information concerning a rape, where such explicit publication of the information was integral to supporting the station's theory that the man convicted of the crime was in fact innocent. We held that the test for when first amendment rights outweigh individual privacy interests is the same under Texas state law and federal constitutional law. In that case, the rape victim's privacy interest was outweighed by the news station's right to publish a matter of legitimate public concern.

However, we carefully restricted the reach of our opinion, stating,

The disclosure plaintiffs contend that no constitutional privacy right is implicated in the release of this information (even though they accept that it was unlawfully gathered) because, while the release of information may defame some individuals, defamation is not a constitutional tort. However, the mere fact that the release of the information in the files may give some persons grounds on which to sue for defamation does not preclude individuals from exercising other protections against the material's

publication; moreover, defamation is not only a nonexclusive but also an underinclusive remedy. Privacy rights are directed not only to the publication of false statements about individuals but equally to the publication of true statements about persons where those true statements were either obtained unlawfully or contain private facts that the government should not divulge. Therefore, a cause for defamation supplements, rather than supplants, the individuals' constitutional privacy rights.

Our holding today is narrow. Our decision turns upon the peculiar facts present in this case. We point out that the doctrine we announce today, although it justifies the district court's award of summary judgment against Ross, does not leave rape victims without any protection against public disclosure of their names. First, the discussion above leaves open the possibility that the rape victim's name may be irrelevant when the details of the rape victim's experience are not so uniquely crucial to the story as they are in this case, or when a publisher's 'public concern' goes to a general, sociological issue. Second, the discussion leaves open the state's power to protect rape victims' privacy by preserving the confidentiality of the state's records, and punishing any who steal the information. Liability for the wrongful taking of information could encompass damages resulting from the foreseeable publication of the information.

*Id.* at 275.

Regarding the above excerpt, we note first that because the public concern in this case is bringing to the public's attention the various activities of the Commission, the disclosure of a particular name would rarely, if ever, be necessary to enumerate and demonstrate the Commission's divers dealings; the actual names of the Commission's victims are much less a matter for public concern. Second, the excerpt plainly shows that whether the state could properly restrict access to material in its possession was not at issue in *Ross*. *Ross* addressed only the right of a private media organization possessing lawfully obtained information of public concern to release that information without liability for defamation or violation of individual privacy rights. By way of contrast, the instant case concerns whether a court must order that (often unlawfully obtained) information in possession of the state must be released in its entirety even where, to the extent that that information is a matter of public concern, any public need to know could be satisfied by release of the information in a more limited format.

B.

■ The disclosure plaintiffs also argue that limiting access tramples on the right of a free press. However, where the state has a legitimate interest in not making that information available to the general public, the press has no special right of access to it.

'It has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally.... Despite the fact that news gathering may be hampered, the press is regularly excluded from grand jury proceedings, our own conferences, the meetings of other official bodies gathering in executive session, and the meetings of private organizations. Newsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded.' *Branzburg v. Hayes* [, 408 U.S. 665, 684–85, 92 S.Ct. 2646, 2658–59, 33 L.Ed.2d 626 (1972) ]. Similarly, newsmen have no constitutional right of access to prisons or their inmates beyond that afforded to the general public.

*Pell v. Procunier*, 417 U.S. 817, 833–34, 94 S.Ct. 2800, 2810, 41 L.Ed.2d 495 (1974).

Moreover, the right of access to criminal trials established in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), does not apply here. In *Calder v. Internal Revenue Serv.*, 890 F.2d 781, 783 (5th Cir.1989), we held,

Calder urges this Court to conclude that the reasoning behind the *Richmond* line [of cases] mandates the conclusion that the right of access is not limited to criminal proceedings, but extends to other governmentally held information. We decline to do so, and hold that Calder has not established the existence of a constitutional right of access to the IRS records of Al Capone.

We explained our position further by quoting from *Houchins v. KQED, Inc.*, 438

U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978), where the Court stated,

> 'There is no constitutional right to have access to particular government information, or to require openness from the bureaucracy.... The public's interest in knowing about its government is protected by the guarantee of a Free Press, but the protection is indirect. The Constitution itself is neither a Freedom of Information Act nor an Official Secrets Act.'

*Calder,* 890 F.2d at 784 (quoting *Houchins* ).[5]

### C.

◼ Limiting access to the Commission's files also does not create a prior restraint. While the media generally have a right to publish information that they obtain, "[n]either the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control." *Houchins,* 438 U.S. at 15, 98 S.Ct. at 2597. Indeed, the government may well be able to protect the information by prescribing punishments for those who are entrusted with maintaining the confidentiality of that information and then violate that trust. *See Ross,* 870 F.2d at 275; *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 836–37, 98 S.Ct. 1535, 1540–41, 56 L.Ed.2d 1 (1978). The privacy plaintiffs are only asking the court not to *order* full disclosure of the files; they are not asking the court to prevent parties that are lawfully in possession of the information, and wish to disclose it, from doing so.

Furthermore, limiting access would not subject to a prior restraint those plaintiffs who, through court proceedings, had access to the files. The plaintiffs' access was specifically subject to a protective order, and such protective orders are lawful restraints on dissemination. *See Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 32–

34, 104 S.Ct. 2199, 2207–08, 81 L.Ed.2d 17 (1984).

### D.

◼ The disclosure plaintiffs also argue that, aside from any free press or prior-restraint concerns, there is a public right of access to the information contained in the files (citing *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), and *In re Application of Newsday, Inc.,* 895 F.2d 74 (2d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 2631, 110 L.Ed.2d 651 (1990)). In *Newsday,* where both an interest in public disclosure and privacy rights were at stake, the court stated, "[T]he court should consider 'whose privacy interests might be infringed, how they would be infringed, what portion of the tapes might infringe them, and what portion of the evidence consisted of the tapes.' " *Id.* at 79 (quoting *Waller v. Georgia,* 467 U.S. 39, 48, 104 S.Ct. 2210, 2216, 81 L.Ed.2d 31 (1984)). The court further explained,

> [T]he privacy interests of innocent third parties as well as those of defendants that may be harmed by disclosure of the Title III material should weigh heavily in a court's balancing equation.... The job of protecting such interests rests heavily with the trial judge, since all the parties who may be harmed by disclosure are typically not before the court.

*Id.* at 79–80.

In *Newsday,* the court found that the district court had not abused its discretion in redacting references to innocent third parties. Thus, *Newsday* indicates that a balancing of the privacy interest with the access interest, rather than an absolute right to access, is appropriate. Similarly, in *Nixon v. Warner Communications, Inc.,* while the Court recognized a right to access, it also explained that where a privacy interest is also implicated the court

---

**5.** In *Calder,* we did say that "[t]he determination of who should have access to particular government held information and what constitutes a legitimate use of such information is 'clearly a legislative task which the Constitution has left to the political processes.'" 890 F.2d at 784 (quoting *Houchins* ). But in that case, there was no indication that any constitutional interest was at stake; thus, once the court determined that there was no constitutional right of access, it could properly leave the decision to the legislature. In the instant case, the court must consider not only the right to access but also individual privacy rights.

could properly proceed with "the task of weighing the interests advanced by the parties in light of the public interest and the duty of the courts." 435 U.S. at 602, 98 S.Ct. at 1314.

### E.

■ The disclosure plaintiffs also argue that anything less than a complete release of all the materials will impair the ability of those who have been maligned to clear their name. They note that, as the information will surface in 2027, those who have been wrongfully impugned should be able to marshal current evidence and data to rebut those instances of defamation before such evidence disappears. However, a name-redaction system (as well as other restricted disclosure methods proposed by the privacy plaintiffs) permits individuals to have access to information in the files about them personally and also does not preclude those individuals' submitting rebuttal statements for inclusion in the files.[6]

In any event, the district court overemphasized the importance of having the ability to rebut information, because it weighed the competing privacy interests too lightly. In determining that the ability to rebut information greatly outweighs any privacy interest, the district court held that "[t]he interests of those investigated have already been compromised" because the information was bound to be released anyway, and the delay until 2027 was "not a real protection of privacy" but only a "brief hiatus" until the potential damage that could be caused by the release of information in the files would actually occur. *See ACLU v. Mabus,* 719 F.Supp. at 1360. Thirty-seven years in a human life, though, can hardly be considered a "brief hiatus," especially as almost all of the persons about whom there is information in the files presumably are at least forty years of age as of this writing.

### F.

In addition, the district court suggested that state law, and specifically the Missis-

sippi Public Records Act of 1983, Miss.Code Ann. § 25–61–1 *et seq.,* will provide, for the most part, sufficient protection for the privacy plaintiffs' concerns. The disclosure plaintiffs, though, do not assert this argument on appeal and in fact assert strenuously that state law in Mississippi and elsewhere generally would require disclosure of all materials. More importantly, the district court refused to "moderat[e] its injunction to allow a period of time for individuals to assert privileges protected under law or exemptions to the Mississippi Public Records Act." *ACLU v. Mabus,* 719 F.Supp. at 1362. Thus, any privacy protections provided by the Public Records Act would be ethereal in this case.

The privacy plaintiffs are seeking protection based upon a constitutional right whose scope will be independent of the boundaries of state disclosure laws. Thus, unless such laws provide broader protection than is constitutionally required (which the disclosure plaintiffs as well as the privacy plaintiffs dispute), then state law will provide insufficient protection of the constitutional privacy right. Here, we need not make any prediction as to what degree of protection would be provided by Mississippi statutes in order to vacate the district court's decision, as we find the complete disclosure ordered by the court to be a violation of constitutional privacy rights.

### IV.

■ The disclosure plaintiffs' remaining arguments all center upon their assertion that limitations on disclosure will impair the ability of certain claimants to bring civil actions. The disclosure plaintiffs rely heavily upon *Ryland v. Shapiro,* 708 F.2d 967 (5th Cir.1983). There, we held that the defendant state actors could be held liable for a cover-up and conspiracy to obstruct justice involving an alleged murder by a state prosecutor. The court found that such actions would deprive the plaintiff of proper access to the courts.

---

6. The disclosure plaintiffs have endorsed the idea of having a mechanism for filing such a rebuttal statement but have argued that, without full disclosure, effective rebuttal will not be possible.

The critical distinction from the instant case, though, is that *Ryland* did not involve any constitutional privacy right. Here, improper governmental actions were directed against innocent citizens, and it was those citizens whose privacy rights were violated by the government's gathering of information. In *Ryland*, on the other hand, the information that the government would not disclose did not include personal information about innocent citizens. Rather, it showed the culpability of certain state actors. In the instant case, the privacy plaintiffs do not propose to conceal any of the unlawful acts perpetrated by the government, but merely to redact names or disguise the identities of those victims of such governmental improprieties. Hence, *Ryland v. Shapiro* is inapposite.

Both the district court and the disclosure plaintiffs, though, did identify one potentially significant shortcoming of the privacy plaintiffs' plan to redact names and remove all other information that could identify particular individuals. The events transpired so long ago, and were of such a clandestine nature, that an archivist or compiler of the records would be unable to identify persons described, but not specifically named, in the files. Thus, some victims of improper intrusion and interference by the government would not know of their inclusion in the files, since the archivist would not be able to direct such persons to the respective sections in the files that had dealt specifically with them.

Because under the privacy plaintiffs' proposal, identifying characteristics or features of unnamed persons would be removed from the information generally accessible, those particular persons, when examining the files, also would not be able to identify themselves. Thus, these persons would be subject to possible undue embarrassment and recrimination and other adverse effects in 2027 when the information would be made public with the identifying features. At that juncture, these persons, described but not named in the files, would become identifiable by others but would have lost their chance over the years to prepare any possible rebuttal to the information in question.

It would probably require a thorough and intensive examination of the files to determine how many individuals are described in the files with sufficient specificity that certain persons with some knowledge of the events may identify them from the description, yet are not named or identified sufficiently to a general audience so that an archivist would be able to direct these persons to specific references to themselves in the files. The incidence of unnamed but identifiable persons in the files is for the district court to determine, in its discretion.

The court may choose to follow the privacy plaintiffs' method of both redacting names and removing identifying information from unnamed but potentially identifiable persons in the files. Or, it may decide that the interest in making it easier for these unnamed persons (who would be identifiable to some persons but not necessarily to an archivist) to take corrective legal action[7] is substantial enough to overcome the competing privacy interests, in which case it could order only the redaction of actual names but not identifying references. The court may also consider the relative expense associated with each method and may devise a method of its own.[8]

Although we leave the district court broad discretion to fashion a remedy, we vacate its decision to release the files to the public without restriction. On the basis of the appraisal of the files' contents that we can make based upon the record before us,

---

**7.** We emphasize that we express no view as to the legal sufficiency of any such civil actions.

**8.** We do not expect the costs associated with creating a limited disclosure system to be as great as the disclosure plaintiffs suggest. As approximately three-fourths of the documents in the files are materials that have already been published, at most one-fourth of the materials need be subject to access restrictions. Hence, because the materials fill six file cabinets, very roughly one and one-half file cabinets of materials may need to be catalogued. This should not be overly onerous, especially as the files already include an extensive (apparently comprehensive) index by name and subject matter.

we find that the relief granted does not give sufficient weight to the interest in accommodating privacy concerns. For instance, even the simple task of redacting actual names but not deleting any identifying information about unnamed persons would protect privacy to a considerable extent while likely having almost no adverse effect upon the ability of victims of unlawful intrusion to gain information concerning that intrusion.[9]

The first potential adverse effect of so limiting access, in terms of depriving potential victims of their ability to ascertain how their rights had been infringed, is that if several persons are described together where some are named and some are unnamed, the redacting of names may make an unnamed person reading the files unable to identify a reference to himself or herself; whereas, if the names were unmasked, he or she might instead be able to recognize that the unnamed person mentioned in the files was in fact himself or herself or someone else known thereto. From our review of the very limited portions of the files in the record, we have found few mixed references to named persons and unnamed persons in the same file.

If the sample in the record is representative of the files as a whole, we think that redacting names would easily do much more good in terms of protecting privacy interests than it would do harm by possibly making it more difficult for a few individu-

als to identify information about themselves. We remand to the district court, though, for it to consider possible methods of limiting access to information in light of the nature and prevalence of the various types of references to individuals contained in the files.[10]

Therefore, we remand this matter to the district court to devise a plan that accommodates the interests we have described. We are confident that the able court will effect the required balancing resourcefully and fairly.

VACATED and REMANDED.

9. For demonstration purposes only do we compare complete disclosure with a disclosure system that affords only the limited privacy protection of having actual names of individuals who were not state actors redacted. We do not suggest that this necessarily is an appropriate disclosure method for the district court to adopt on remand; we merely mention one alternative to complete disclosure that better protects constitutional privacy interests with little commensurate detriment to any rights of access to the courts and to publicly-held information. Thus we can say that it was beyond the discretion of the district court to choose the remedy of complete disclosure when this more limited option existed. We note that the privacy plaintiffs were not given an opportunity to present any proposals for more limited access that would not deprive various plaintiffs of their ability to bring suit and rebut charges against them; on remand, improved proposals may emerge.

10. The disclosure plaintiffs identify an additional problem that would be present even where only names were redacted: They claim that the archivists would not be able accurately to distinguish true state informants from ones who were merely alleged to be informants. Thus, a scheme designed to reveal more information by not redacting the names of state informants may intrude upon the privacy interests of persons falsely identified as state informants. This might require a compromise of certain "innocent" informants' privacy interests in order to preserve plaintiffs' access to relevant information, but, in any case, at least the privacy of named non-informants would still receive considerable protection under the name-redacting scheme with little detriment to potential plaintiffs. Again we leave it to the district court to conduct the appropriate balancing, and we recognize that no system of disclosure will be perfect.