**AMERICAN CIVIL LIBERTIES UNION OF MISSISSIPPI, et al., Plaintiffs,**

v.

**Kirk FORDICE, et al., Defendants.**

**Civil Action No. J77–0047B.**

United States District Court, S.D. Mississippi, Jackson Division.

May 31, 1994.

Shirley Payne, Horn & Payne, Jackson, MS, Barry H. Powell, Alston, Rutherford & Van Slyke, Jackson, MS, for American Civil Liberties Union of Mississippi, Inc.

Shirley Payne, Horn & Payne, Jackson, MS, for Delta Ministry, Owen Brooks, Ken Lawrence, Rims Barber.

Dixon L. Pyles, Sr., Pyles & Tucker, Jackson, MS, for Edwin King, John Salter.

Edward J. Peters, District Attorney's Office–7th Judicial District, Jackson, MS, Davis C. Scott, Jr., Office of the Attorney General, Jackson, MS, for Commissioner of Public Safety, Kirk Fordice.

*MEMORANDUM OPINION AND ORDER*

BARBOUR, Chief Judge.

This cause is before the Court on remand from the United States Court of Appeals for the Fifth Circuit for this Court to devise a remedy for opening the files of the now defunct State Sovereignty Commission ("the Commission") while balancing the competing interests of the "privacy Plaintiffs" and the "access Plaintiffs." Having considered the opinion of the Fifth Circuit and the supporting and opposing memoranda of all parties to this action, the Court finds that the files should be opened in accordance with the procedure set forth below.

## I.  Background

### A.  Procedural History and ACLU I

The detailed facts of this case are set forth in the previous opinion of this Court, *American Civil Liberties Union v. Mabus,* 719 F.Supp. 1345 (S.D.Miss.1989) ("*ACLU I*"), and will not be repeated at great length in this opinion. A brief summary of the facts and procedural history is necessary and relevant to the current issues before the Court. The Commission was created in 1956 as an agency of the State of Mississippi ostensibly "to protect the sovereignty of the State of Mississippi, and her sister states, from encroachment thereon by the Federal Government...." Miss.Code Ann. § 3–1–11 (1972). The understood purpose of the Commission, however, was to maintain racial segregation in the South despite orders to the contrary by the United States Supreme Court.[1] As the secret intelligence arm of the State, the Commission engaged in a wide variety of unlawful activity, thereby depriving the Plaintiffs of their constitutional rights to free speech and association, to personal privacy and to lawful search and seizure. The Commission also deprived Plaintiffs of rights protected by the statutes of the United States.

> Deprivations were accomplished through unlawful investigations and through intentional actions designed to harass and stigmatize individuals and organizations engaged in speech and conduct protected by the United States Constitution. The targets of Commission activity were designated by members and agents of the Commission. There is no record that a search warrant or any other judicial sanction of Commission acts was either sought or received. The avowed intent of the Commission and its co-conspirators was to chill or

---

**1.** *See Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955).

preclude the Plaintiffs from speech, assembly, association, and the petition of government.

*ACLU I,* 719 F.Supp. at 1353.

In 1977, the Mississippi legislature voted to disband the Commission and directed that all Commission records be destroyed. The Plaintiffs in this action obtained an order prohibiting such destruction. The legislature reacted by enacting laws sealing the files until the year 2027. *See* Miss.Code Ann. § 39–5–61 (1972). After the vacation of an earlier denial of class certification by the judge to whom this case was originally assigned, this Court certified the Plaintiff class as

all natural persons, all not-for-profit associations and all unincorporated associations who, in or around the State of Mississippi, have been or continue to be subject to investigation, surveillance, intrusions or the dissemination of false and misleading information by agencies of the State of Mississippi or those acting in concert with said agencies.

*ACLU I,* 719 F.Supp. at 1351–52. In 1987, the Court subdivided the class "to assure its adequate representation." *Id.* at 1352. The subclasses include (1) the "access Plaintiffs," composed of persons whose members seek unlimited public access to the records of the Commission, and (2) the "privacy Plaintiffs," whose members seek access to the records for those named in the records, but who advocate no further access by other parties without the prior consent of each person or persons described in a particular record.

In *ACLU I,* this Court entered an Order which, *inter alia,* enjoined the State from enforcing the Mississippi statute which makes it a felony to release any information contained in the files, *see* Miss.Code Ann. § 39–5–63 (1972), and required the State to maintain the Commission files as any other public record according to state and federal law.[2] *Id.* at 1363; *see also American Civil Liberties Union v. State of Mississippi,* 911 F.2d 1066, 1068, *reh'g en banc denied,* 919 F.2d 735 (5th Cir.1990) ("*ACLU II* "). This

Court attempted to balance the equities in *ACLU I* concluding that:

To open the files would further the general principle of informed discussion of the actions of government, while to leave the files closed would perpetuate the attempt of the State to escape accountability. Opening the files would also end public speculation as to the extent of the acts of the Commission, much of which has far exceeded the record.

719 F.Supp. at 1362. Recognizing the interests of the privacy Plaintiffs, the Court also ordered the Defendants in this matter to accept any rebuttal submitted by a class member regarding an allegation, charge or other information contained in the files concerning that class member, such rebuttal to become a part of the files to be indexed and cross-referenced accordingly. *Id.* at 1363.

## B. *ACLU II*

The issue on appeal in *ACLU II* was the order of this Court that "all Commission files be disclosed and accessible to the general public." *ACLU II,* 911 F.2d at 1068. The Fifth Circuit vacated the opinion of this Court in *ACLU I* holding as follows:

The privacy plaintiffs have not requested, and we do not recommend, that the Commission's files remain entirely inaccessible to the public. We hold today only that on the record before us, complete and unfettered disclosure of the files does not give appropriate protection to the constitutional privacy interests of various persons in not having government-gathered sensitive personal information about them released.

*ACLU II,* 911 F.2d at 1066. The court reasoned that the privacy Plaintiffs have an interest in restricting the disclosure of information which must be balanced against the competing interest of the access Plaintiffs. *Id.* at 1070. The court described the competing interests of the various Plaintiffs in this action:

[W]e note first that because the public concern in this case is bringing to the public's attention the various activities of

---

**2.** This Order effectively enjoined the State from enforcing Miss.Code Ann. § 39–5–61 (1972) which provides that the files will be kept under seal until the year 2027.

the Commission, the disclosure of a particular name would rarely, if ever, be necessary to enumerate and demonstrate the Commission's divers[e] dealings; the actual names of the Commission's victim's are much less a matter for public concern. . . . [T]he instant case concerns whether a court must order that (often unlawfully obtained) information in possession of the state must be released in its entirety even where, to the extent that that information is a matter of public concern, any public need to know could be satisfied by release of the information in a more limited format.

*Id.* at 1071. The court discounted the concerns of the access Plaintiffs and the Defendants regarding the cost of a limited disclosure system, concluding that because approximately three-fourths of the material in the Commission files has already been published, only about one-fourth of the material need be subject to access restrictions. *Id.* at 1074 n. 8.

#### C. *Procedural History Since ACLU II*

Several status conferences have been held and resulting Orders issued since the Fifth Circuit mandate on November 16, 1990. On March 12, 1991, the Court entered an Order granting access to the files to (1) personnel with the Mississippi Department of Archives and History ("MDAH") for the purpose of cataloguing the records, and (2) parties to this suit. In that Order, the Court required anyone seeking to view the documents to sign a confidentiality Oath, under penalty of contempt of court, acknowledging that any information contained in the Commission documents could not be communicated to third parties.[3] Subsequent Orders indicate that MDAH has inventoried the contents of the Commission files, including noting which documents in the files are published documents. Much of the delay up to this point

has been to allow MDAH to prepare an extensive index of the Commission files. An evidentiary hearing was held on September 20 and 21, 1993, and testimony was received concerning recommended procedures which might be used to open the Commission files as well as various practical problems which will exist. After this hearing, all parties submitted posthearing briefs concerning suggested solutions for balancing the competing interests involved in this action.

#### II. *Analysis*

#### A. *Files Shall Be Presumptively Open*

Many notable events have occurred since the opinion of this Court in *ACLU I.* Several newspaper articles were published in the major statewide daily newspaper, *The Clarion Ledger,* stating that the Commission had conducted jury research of the persons composing the juries in the first two murder trials of white supremacist Byron de la Beckwith,[4] These articles, combined with other factors, prompted the District Attorney for the Seventh Circuit Court District to reopen the case and try Beckwith for a third time.[5]

On September 21, 1993, the Court conducted a portion of the hearing in chambers due to issues which arose during the testimony of Erle Johnston, former Director of the Sovereignty Commission from April 1, 1963, until July 1, 1968. During the hearing in chambers, Johnston testified that he had obtained copies of Sovereignty Commission documents from the office of Dixon Pyles, counsel for the privacy Plaintiffs. According to Johnston, he was in Pyles office one day when some boxes were delivered. Pyles told Johnston that the boxes contained Sovereignty Commission documents. Later, Johnston returned to Pyles' office to ask if he could copy the documents. Pyles was not in, but his secretary gave Johnston permission to re-

---

**3.** The substance of the Oath is as follows:

I understand and agree that I can be given access to the Sovereignty Commission Files only upon the stipulation that, unless future orders allow further dissemination, the documents and information which I examine or which are provided me cannot be communicated or disseminated in any fashion except to persons who are also bound by this oath so

that those individuals will also be prohibited from making any further disclosures.

**4.** Beckwith was accused of murdering civil rights leader Medgar Evers.

**5.** The Court notes that in the third trial, some thirty years after the offense, Beckwith was convicted for the murder of Medgar Evers.

move the files from the office and have copies made. These copies were then given by Johnston to Sid Salter, Publisher of the *Scott County Times*, whose syndicated weekly column appears statewide. These files have since been produced to the Court and are currently under seal.[6] Salter wrote several columns about the Commission files, and apparently shared the files, or portions thereof, with other journalists.[7] It is unclear from the testimony at the hearing in this matter whether the articles which appeared in *The Clarion Ledger* concerning the Beckwith juries were written by journalists who had access to the files given to Salter by Johnston.

Finally, the Court notes that an extensive collection of documents, known as the Paul B. Johnson papers, is housed at the University of Southern Mississippi. Many of these documents are duplicates of documents in the Commission files. The Johnson papers are available to the public for research purposes. All of the above instances of disclosure reinforce the propositions that (1) the public has a right to know what is contained in the Commission files, and (2) as a practical matter, many of the documents from the files are already in circulation.

■ The Court therefore finds that the Commission files should be presumptively open. The procedures for rebutting this presumption will be outlined below. During the hearing in this matter, testimony was given that when similar files were noticed to be opened in other jurisdictions, there was little interest in such files. The Court believes that, after an initial flurry of articles by the media, there will be a similar lack of interest

by the general public in the files which are the subject of this case. Thus, the Commission files will be presumptively open, but the privacy Plaintiffs will have an opportunity to request that their individual files be redacted or remain sealed.

The Fifth Circuit has mandated that this Court devise a plan to open the files which will accommodate the interests of the privacy Plaintiffs in restricting the disclosure of information and the interests of the access Plaintiffs who wish to have the files completely open. *ACLU II*, 911 F.2d at 1070. As noted in *ACLU II*, the privacy Plaintiffs "do not propose to conceal any of the unlawful acts perpetrated by the government, but merely to redact names or disguise the identities of those victims of such governmental improprieties." *Id.* at 1074. The Fifth Circuit also noted that the privacy Plaintiffs are not seeking to "prevent parties that are lawfully in possession of the information, and wish to disclose it, from doing so." *Id.* at 1072.[8] With these considerations in mind, the Court must devise a mechanism for opening the files while protecting the interests in confidentiality of the privacy Plaintiffs.

The Fifth Circuit in *ACLU II* suggested that only one-fourth of the materials need be subject to any access restrictions because approximately three-fourths of the material has already been published. *ACLU II*, 911 F.2d at 1074 n. 8. The court also mentioned, for demonstration purposes only, the possibility of redacting all names from the previously unpublished materials in the files. *Id.* at 1075 7 n. 9. After receiving evidence at the hearing in this matter, specifically the testimony of several archivists, the Court finds

---

**6.** Salter had given these documents to the Mississippi State University Library, under seal, to be opened ten years after Salter's death.

**7.** According to an Affidavit from Leesha Lee Faulkner, former journalist with *The Clarion Ledger*, a source gave the newspaper several loose-leaf binders of copied documents from the Commission files. According to Faulkner, that source was Sid Salter.

**8.** The privacy Plaintiffs have taken a different position since the remand of this case asserting that there should be no distinction between state actors and victims and that each person named in the files should be contacted concerning

whether that person wishes to open his or her file. At one point, the privacy Plaintiffs also argued that this Court should seal all Commission files, including the Paul B. Johnson files located at the University of Southern Mississippi. Because these positions were apparently not asserted on appeal (these issues are not mentioned in this context in *ACLU II*), the Court will not address them on remand. The Court notes, however, that it only has jurisdiction over the Commission files which are currently held by MDAH. Furthermore, it would serve no useful purpose for this Court to close files, such as the Johnson files at the University of Southern Mississippi, which have been in the public domain for years.

that the solution mentioned by the Fifth Circuit is not viable. The archivists testified that most of the files are comprised of published materials as well as unpublished materials. The archivists advised against removing previously published documents from their places in the original files and stressed to the Court the value of maintaining all materials in the files in sequential order. The Court finds that the original arrangement of the files has historical value in and or itself. Therefore, simple redaction of all the names in the materials in any given file will not necessarily protect the privacy interests of those individuals. *See infra* at 411–412. The remedy set forth in this opinion attempts to accomplish the goal of maintaining the original integrity of the files, while balancing the competing interests of the various Plaintiffs in privacy and disclosure.

### B. *Status of Those Persons Named in the Files*

■ Privacy Plaintiffs who are named in the files have a right to confidentiality and should be able to have input concerning the opening of their files. State actors, however, have no such rights with regard to Commission files because those persons were responsible for violating the constitutional rights of the victims. The victim category is hereby defined as any person who was subject to investigation, surveillance, intrusions or the dissemination of false and misleading information by the Sovereignty Commission of the State of Mississippi or those acting in conjunction with that agency.[9] The state actor category is hereby defined as any member, employee or informant (paid or otherwise) of the Commission and any person who requested information from the Commission during its existence. The state actor category does not include persons employed by the State, such as a State legislator, unless that person was affiliated with the Commission in the manner described above or requested information from the Commission during its existence.

MDAH is the logical agency which should initially determine the status of persons named in the Commission files. As part of an indexing process, MDAH should make a list of all names in the files and classify each of those persons as either a victim or a state actor. This classification shall be completed and made available to the litigants within one year of the date of this order. This system will not be perfect, and the Court recognizes that problems may arise. For example, a person may be categorized as a victim in one part of the files and a state actor in another portion. Whether such persons, who may be classified in both categories, have waived any privacy rights by acting in conjunction with the Commission may be determined at a later date.[10] The litigants in this action shall have a right to review the list compiled by MDAH and the material in the files pertaining to the individuals listed for the purpose of deciding whether any challenges will be made concerning the status of any given person on the list.[11] Persons classified as state actors may also, as a part of this process, challenge the status which has been assigned them by MDAH.[12] The litigants in this action may also file an objection to the position taken by a person objecting to his or her state actor status. Presumably there will be no status challenges by persons classified as victims of Commission activity. Any files which have been challenged will remain sealed until the challenge is resolved.

■ The Court has found that individuals whose names appear in the Commission files should be classified as either state actors or

9. This definition is taken from the Plaintiff class definition as certified by this Court on August 18, 1982. *See ACLU I,* 719 F.Supp. at 1351–52.

10. If during this process MDAH discovers numerous persons who were both victims and state actors, MDAH should notify the Court and an appropriate procedure for classifying these persons will be devised by the Court.

11. When reviewing this list and materials, the litigants will be bound by their previously signed

confidentiality Oaths and will remain subject to the contempt powers of this Court. Furthermore, this list and materials are for administrative purposes only and shall not be disclosed to the general public.

12. Because the Court does not know, at this time, how many challenges, if any, will be made regarding the status of persons in the files, the Court will not devise a procedure at this time for handling such challenges.

victims. The Court finds that there should be no separate category for public figures. Defendants have asserted that the Court should adopt the definition of public figure set forth in *Gertz v. Welch,* 418 U.S. 323, 351–52, 94 S.Ct. 2997, 3012–13, 41 L.Ed.2d 789 (1974), that there must be "clear evidence of general fame or notoriety in the community" in order for a person to be considered a public figure. Because this Court has previously found that the actions of the Commission were unconstitutional and unlawful, all persons who were subject to such unlawful activity are entitled to have their privacy interests protected. Even if a person was a public figure, that does not entitle others, especially the State, to engage in unlawful activity concerning that person and disseminate such information simply because the person is well-known in the public domain.

■ The access Plaintiffs have asserted that any dead persons whose names appear in the files should have no privacy rights because an action for defamation dies with the person. Defendants, to the contrary, argue that a person's right to privacy does not end at death. Even though a person's right to sue for defamation may end at death, that person's constitutional right to privacy is a separate and independent right:

> [T]he mere fact that the release of information in the files may give some persons grounds on which to sue for defamation does not preclude individuals from exercising other protections against the material's publication; moreover, defamation is not only a nonexclusive but also an underinclusive remedy.... Therefore, a cause for

defamation supplements, rather than supplants, the individuals' constitutional privacy rights.

*ACLU II,* 911 F.2d at 1070 n. 4. Assuming without deciding that privacy rights continue after death, the Court, in balancing the interests involved in this action, finds that the files of deceased persons should be open to the public. The right of the public to know about the unlawful activities of its government must be considered and should be weighted more heavily in cases of deceased victims, who can suffer no embarrassment, than in cases where the victim is still living. The files of deceased persons will therefore be open to the public as soon as the imaging and indexing process is complete.[13]

### C. *Procedure for Dealing with Requests*

■ MDAH will be charged with copying and indexing the files so that it can respond to inquiries from individuals concerning whether their names appear in the files.[14] MDAH must be able to determine whether the inquiring person is named in the files and whether that person is a victim or a state actor. MDAH must also be able to provide a copy of his or her file to the inquiring person. At the hearing in this matter and in the post-hearing briefs, the Court was presented with three alternatives from the Defendants concerning the most efficient way to copy and index the Commission files. Defendants have asserted that the most cost-effective method of dealing with the documents in the Commission files is by using a computer imaging system.[15] The Court offers no opinion concerning whether this system or some other system should be used. This is a matter for the Defendants to decide, so long

---

**13.** The Court recognizes that MDAH has no way of knowing whether some persons are deceased. In obvious cases, for example a file on Medgar Evers, the file should be opened. In other cases, when no response is received from that person, the files will be opened just as any other files for which no response has been received.

**14.** The procedures set forth in this opinion will preempt the procedures set forth in the Mississippi Public Records Act of 1983, Miss.Code Ann. § 26–61–1 *et seq.* That Act will not be applicable to the Commission files which are the subject of this case because of the nature of the interests involved and the specificity of the procedures set

forth in this opinion concerning the opening of the Commission files.

**15.** The Court has been informed that this system is computerized and will be able to store materials word for word. Defendants describe the system as being similar to a copying machine because documents will be fed through an imager, and a copy will be produced into the computer. These documents may then be retrieved in accordance with an indexing system, and the equipment will reproduce copies in their original appearance. Using the equipment, the MDAH will have the ability to redact names and other identifying information.

as the system chosen will allow the Defendants to comply with the orders of this Court. The system chosen by the Defendants must permit MDAH to have a bank of information readily available which will serve two purposes: (1) permit MDAH to respond to inquiries during the notice period; and (2) allow the Commission files to be opened to the public in an accessible form at a later date while preserving the integrity of the original documents.[16]

The Court must also be concerned with the privacy rights of other individuals regarding responses to inquiries about Commission files. Due to these competing privacy interests, any documents which are sent to a person inquiring about his or her file during the inquiry period must have all names of victims, who have responded to the notice, redacted from such documents.[17]

■ The Court is aware that some files contain documents which are already in the public domain, such as excerpts from books and newspaper articles. The Court recognizes that even if a name is redacted from a newspaper article, any researcher could obtain a copy of the article from other sources and determine the identity of the individual whose name has been redacted from the article. By balancing the competing interests in this case, the Court is aware that no set of persons will be in complete agreement with the plan devised by this Court. As noted by the Fifth Circuit in *ACLU II*, "no system of disclosure will be perfect." 911 F.2d at 1075. Regarding documents which are in the public domain, if a file contains only material which has already been made public, the Court finds that such files should remain completely open and unredacted.[18] If the file contains anything other than public material, however, the file will be subject to the redaction process or to closure, depending upon the victim's request.[19]

It has been noted that the Fifth Circuit in *ACLU II* recognized that approximately three-fourths of the files are comprised of newspaper clippings or other published materials. These published materials in many instances are placed in the files with related unpublished materials. The archivists have stated that the historical value of the files depends in part upon maintaining the sequential integrity of the files. Accordingly, if an individual requests that his name be redacted from the file pertaining to him; if that file contains both published and unpublished documents; and if his name is redacted from the unpublished documents but not redacted from the published documents, the individual would receive no real protection. If under the same set of circumstances his name were redacted from both the published and unpublished documents, he would still receive no protection since a researcher could go to the original published source and obtain his

16. The archivists who testified at the hearing in this matter were concerned with maintaining the files as they are currently arranged. They testified and the Court has found that original arrangement has historical value in and of itself. The computer imaging system proposed by the Defendants should alleviate these concerns because that system will allow persons to view the documents and/or copy them without disturbing the originals. Furthermore, the documents can be imaged and maintained in the same order as such documents appear in the files. Also, names can be redacted to preserve the privacy interests where necessary.

17. The complete procedure for responding to inquiries will be detailed further in this opinion. MDAH will be required to hold all inquiries until the end of the inquiry period. Then, at the end of this period if no inquiries are received from certain individuals, then those persons' names need not be redacted from material which is sent to those who have made inquiries.

18. Defendants have asserted that it is not necessary to scan all documents contained in the files because documents in the public domain are readily available from other sources. As noted in the text of this opinion, files containing both public and private documents are subject to the redaction process. Therefore, public documents in such files must be in the computer system, if that is the system the Defendants choose to use. If a file contains only material which is already in the public domain, the Court has no objection to citations to such material, if Defendants also state in that citation where such material may be located. If the material is not readily available, such as at a local public library, then MDAH must make such material available on the computer system.

19. The Court notes that a request for name redaction would require MDAH to redact the name of the individual from all Commission files, not just from a file about that individual.

name. The Court therefore finds that in some individual circumstances, a person's file should be sealed completely, rather than simply having that person's name redacted from the file. If an individual requests that his or her file be closed, some sort of adjudication will be necessary at that point to balance the privacy rights of that individual against the right of the public to know what is in the file. The procedure for challenging such closure will be similar to the procedure for challenging the status of an individual named in the files. The individual will request complete closure, at which point the litigants in this action will have a right to review that individual's file. Some sort of hearing will then be necessary to balance the competing interests in the matter. Furthermore, any files for which complete closure has been requested will remain sealed until any challenges to such closure are resolved.

Several options are available, therefore, to persons who are named in the Commission files. First, the person may simply not respond to the notice given by the Defendants, in which case that person's file shall be opened. The burden is on the individual to respond to the public notices. If no response is received, this inaction will be treated as a waiver of that person's privacy interest. Second, the person may respond to the notice, ask whether his name appears in the files, and if so, ask for a copy of such files. The responding victim then has several options: (1) request that his file remain open; (2) request that his name be redacted from the file; (3) request that any identifying characteristics be redacted from the file; (4) request that his file be sealed;[20] (5) request to supplement the file with additional information;[21] or (6) challenge the status which he has been assigned by MDAH.[22] If an individual challenges his state actor status or requests the complete closure of his file, such files will remain sealed until the status or closure issues are resolved. If a file is supplemented, MDAH must send such supplementations to persons requesting information if that person's name appears in the supplemented information. If after requesting and being provided with copies of documents from the files, the inquiring person does not further respond to MDAH within 30 days, that individual will be deemed to have waived his privacy interest.

### D. Notice

In order for persons to know whether their names are contained in the Commission files, they must have some sort of notice. Defendants assert that the nature of the relief to be granted is prospective in nature and thus barred by the Eleventh Amendment to the United States Constitution.[23] The Court finds that the relief granted in this case does not violate the Eleventh Amendment because that amendment does not bar "prospective injunctive relief to prevent a continuing violation of federal law." *Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985) (citing *Ex parte Young*, 209 U.S. 123, 155–56, 159, 28 S.Ct. 441, 452, 453–54, 52 L.Ed. 714 (1908)). The *Green* Court concluded that "[r]emedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law." *Id.* (citing *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 102, 104 S.Ct. 900, 909, 79 L.Ed.2d 67 (1984)).

■ The Court finds that so long as the Commission files remain completely sealed, there is a continuing violation of the federal

---

**20.** As noted previously in this opinion, if the file contains only public material, it will be open to the public.

**21.** Any supplementation to the Commission files will be subject to privacy requests from other individuals.

**22.** These options are not necessarily mutually exclusive. For example, a responding victim may choose to supplement his file and have his name redacted from the file.

**23.** The Court notes that in *ACLU I*, this Court ordered that "the named Defendants and their successors in office are charged with serving notice of this Order to class members. Such notice is to be effective but not overly burdensome and may be by commercial publication." 719 F.Supp. at 1363. This portion of *ACLU I* was apparently not addressed on appeal, and arguably should not be addressed on remand. The Court, however, in an abundance of caution, will address the issue of Eleventh Amendment immunity.

constitutional rights of those named in the files. The Fifth Circuit noted in *ACLU II* that " '[t]he disclosure strand of the privacy interest in turn *includes the right to be free from the government disclosing private facts about its citizens* and from the government inquiring into matters in which it does not have a legitimate and proper concern.' " *ACLU II*, 911 F.2d at 1069–70 (quoting *Ramie v. City of Hedwig Village*, 765 F.2d 490, 492 (5th Cir.1985), *cert. denied*, 474 U.S. 1062, 106 S.Ct. 809, 88 L.Ed.2d 784 (1986)). Here, the rights of the victims of Commission activity were violated initially when the Commission investigated them without any legitimate purpose. Those rights would be violated again if information about these victims is disseminated without their knowledge. Therefore, the notice relief which this Court is granting will remedy the initial constitutional violation and prevent future violations of the victims' privacy rights in confidentiality.

The Commission was in existence from 1956–1977, although it was not funded during the last four years of its existence. *See ACLU I*, 719 F.Supp. at 1349. During this period, many persons who were not native Mississippians came into this state to support the civil rights movement and to help blacks register to vote. The Commission files contain many references to these individuals. To protect the rights of those named in the files who no longer reside in Mississippi and to protect the rights of those remaining in this State, the Court finds that notice must be given on a national and statewide basis.

To accomplish the national notice, the Court hereby directs the Defendants to place advertisements in *USA Today*, *The Wall Street Journal* and *The New York Times* which will sufficiently notify those who may have been victims of unlawful Commission activities as to their rights as set forth in this opinion. These advertisements must be at least one-eighth of a page and must run once each week for two consecutive weeks.[24] The Court directs the parties to this action to collaborate to compose an advertisement which will be approved by all the parties involved. The Court also directs the parties to confer regarding on which dates the advertisement should be placed in the various papers. The Defendants have presented the Court with some prices for national advertisements, and the Court has obtained further prices.[25] While these prices are expensive, they are not too onerous a burden for the State to bear for notifying possible victims of illegal Commission activity. The Court will not require that advertisements be placed on national television. As noted by the Defendants, this case is expected to garner national attention such that the televised news media will report the story, including information concerning how the Commission files will be opened.

Regarding notice to victims in this state, the Court finds that the same advertisement should be placed in the twelve daily newspapers published in the state, once each week for two consecutive weeks. The Court will not require advertisements to be placed with local televised news media because the story is expected to be reported by such media.

### E. *Time Frame*

The Court has considered the arguments of the Defendants concerning the time frame for opening the files. The Defendants have requested eighteen months during which to scan and index the Commission files. The Court, however, finds that the files can be indexed and opened to the public in a shorter period of time than that advocated by the Defendants. The Court will allow one year from the date of this opinion for the Defendants to do whatever is necessary to prepare and index the files so that MDAH can respond to inquiries from persons concerning

---

**24.** Defendants have submitted a sample advertisement in their response to this Court. *See* Defendants' ·Response at 11. The Court makes no finding concerning the sufficiency of this advertisement.

**25.** The prices presented to and obtained by the Court are as follows: (1) *USA Today*—National, Friday—$13,984; 1/8 page legal notice in other than classified section—$9,649; (2) The *Wall Street Journal*—1/8 page, weekday—$16,715; (3)

whether their names appear in the files.[26] During the scanning and indexing process, MDAH should classify persons in the files as either state actors or victims and provide this list to the litigants in this action at least by the end of the twelve month period.

The Court expects this case to be appealed, once again, after the entry of this Order. Because the files must be scanned and indexed at some point, the Court directs that this process take place during the pendency of any appeal which might be taken. The Court will not grant a stay to the Defendants pending appeal, and will expect the scanning and indexing process to be completed within twelve months of the date of this opinion.[27]

After this twelve month period expires, the advertisements to give notice to potential victims of Commission activity must be completed within forty-five days of the expiration of the initial twelve month period. Any disputes concerning the content of the advertisements must therefore be resolved during the initial twelve month period, so that the advertisements may run on time. From the date of the last advertisement, potential victims will have ninety days to respond to MDAH concerning whether their names appear in the files. This period will encompass any requests postmarked within the ninety-day period. Defendants have proposed a system of sending a form to those requesting information, requiring them to complete the form and return it to MDAH.[28] Such forms could request pertinent information from the individual such as name, nickname, any other identifying characteristics that might identify that person in the file and other such perti-

nent information. Upon receiving an inquiry by phone or in writing, MDAH should send the standardized form to the inquiring individual within five working days of receiving the inquiry. The inquiring party must return this form postmarked within 15 calendar days of its mailing by MDAH. The notice advertisement must be specific in notifying potential victims of the time frame for responding to the notice and for complying with the procedure for receiving and returning the standardized form.

At the end of the initial ninety day inquiry period, MDAH will have ninety days to respond to requests for materials. MDAH should wait until the end of the initial inquiry period before responding to requests so that it may properly redact the names of parties who have requested information. Thus, MDAH should redact the names of all persons from whom it receives a request for information, before sending out any materials to those who have submitted inquiries. As noted previously, the files for which no response is received shall be opened to the public. Furthermore, any names of persons which appear in the files of another should not be redacted if that person has submitted no response to the notice placed by the Defendants. After MDAH sends materials to parties which have submitted requests, those parties will have thirty days from the date the materials are mailed by MDAH to notify MDAH of their decision concerning whether they wish their files to remain open, to be closed, to have their names redacted, to contest their assigned status or to submit any rebuttal information.[29]

*The New York Times*—1/8 page, weekday— $8,026.

**26.** As noted previously, the Court understands that the process will be accomplished through a computer imaging system.

**27.** If the case is appealed and no opinion is forthcoming from the Fifth Circuit within one year, the remaining time frame set forth in this opinion regarding notice by advertisement and responding to such notice shall begin from the date of the opinion from the Fifth Circuit.

**28.** MDAH must administratively comply with the order of this Court. The Court assumes that MDAH will maintain records concerning inquiries and responses, both by the MDAH and by

the inquirers. The Court also assumes that MDAH will devise forms not only for requesting information but also for responding and that MDAH may wish to include information on these forms concerning certain directives of the Court contained in this and/or other orders. The Court will not require its pre-approval of any such forms or other information sent to inquirers. However, such material should be submitted for comment to the Plaintiffs. If disputes arise, they may be presented to the Court.

**29.** The postmarks on the notifications returned to the MDAH shall be determinative of compliance with the thirty day period. Complete failure to respond or an untimely response shall constitute a waiver of the inquirer's privacy

After MDAH has received all the notifications from persons who have requested their files concerning whether those files should remain open or closed, MDAH will have thirty days in which to finally prepare the files for public disclosure. At the end of this period, the files shall be opened to the public. Therefore, approximately eight months from the date the advertisements are placed in the various newspapers, the Commission files shall be open to the public. If there are disputes concerning the status of a person named in the files, or other similar disputes, the files which are the subject of dispute will remain closed until such disputes are resolved by the Court.

Below is a short summation of the time frames set forth in this opinion for accomplishing the goal of opening the Commission files. The time shall begin from the date of this opinion.

| | | |
|---|---|---|
| 1. | 12 months | MDAH to prepare files, assign status to each individual, prepare-advertisement with help of all parties. |
| 2. | 45 days later | Advertisement to be completed. |
| 3. | 90 days after last advertisement | Inquiries from individuals about the files must be postmarked within this time. MDAH should mail forms within 5 days of receiving requests. Inquirers must return form within 15 days of mailing by MDAH. |
| 4. | 90 days from close of inquiry period | MDAH to respond to all inquiries by providing requested information. |
| 5. | 30 days from date material is mailed by MDAH | Response due from inquirers; if no response, privacy interests waived. Postmark of response will be determinative of timeliness. |
| 6. | 30 days from receipt of last response | Files will be opened to the public except for contested files. |

### III Conclusion

■ The Court having weighed the competing interest of the privacy Plaintiffs, the

access Plaintiffs and the expense to the Defendants in this matter finds that the files of the Sovereignty Commission should be opened in accordance with the instructions set forth in this Memorandum Opinion and Order. The previous Order of the Court in *ACLU II* declaring Miss. Code Ann. § 39–5–63 (1972) unconstitutional, and enjoining the State of Mississippi from enforcing that statute, is still in effect as that finding of this Court was not disturbed on appeal in *ACLU II*. The court also finds that Miss. Code Ann. § 39–5–61 (1972), which would have allowed the files to be opened in 2027, is also unconstitutional because if an individual is entitled to privacy in 1994, he would be entitled to that same right of privacy in 2027. Thus, any files sealed by the procedures set forth in this proceeding shall remain permanently sealed.

IT IS THEREFORE ORDERED that the Defendants in this case shall comply with the instructions of this Court regarding the opening of the Sovereignty Commission files as set forth in detail in this Memorandum Opinion and Order.

IT IS FURTHER ORDERED that Miss. Code Ann. § 39–5–61 (1972) is hereby declared to be unconstitutional and the State of Mississippi is permanently enjoined from enforcing that statute.

rights. *See also supra* note 28 regarding MDAH administrative procedures.