# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 31, 2013

No. 11-41359

Lyle W. Cayce
Clerk

BARBARA WYATT,

Plaintiff - Appellee

v.

RHONDA FLETCHER; CASSANDRA NEWELL,

Defendants - Appellants

Appeal from the United States District Court
for the Eastern District of Texas

Before JOLLY, JONES, and GRAVES, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

As next-friend of her minor daughter "S.W.", Barbara Wyatt brought this suit under 42 U.S.C. § 1983 against high school softball coaches Rhonda Fletcher and Cassandra Newell. Wyatt alleges the coaches disclosed S.W.'s sexual orientation during a disciplinary meeting with S.W.'s mother, primarily claiming the disclosure to the mother constituted a Fourteenth Amendment invasion of S.W.'s privacy. Wyatt also alleged a Fourth Amendment claim based on a disciplinary confrontation in a locked locker room. On the coaches' motion for summary judgment, the district court denied qualified immunity to Fletcher and Newell on the ground that genuine issues of material fact were disputed. We disagree and reverse. We hold that there is no clearly established law holding

No. 11-41359

that a student in a public secondary school has a privacy right under the Fourteenth Amendment that precludes school officials from discussing *with a parent* the student's private matters, including matters relating to sexual activity of the student.  We further hold that such students have no clearly established Fourth Amendment right that bars a student-coach confrontation in a closed and locked room.  We thus conclude that these individual defendants are entitled to qualified immunity that bars the federal claims against them, and, consequently, we REVERSE and VACATE in part and REMAND for entry of judgment dismissing the federal claims against these individual defendants.

## I.

The first matter we must deal with in this qualified immunity case is the basis of our jurisdiction.  On this interlocutory appeal, we have before us the district court's denial of the coaches' motion for summary judgment asserting the claim of qualified immunity.  Our review is *de novo*.  *Flores v. City of Palacios*, 381 F.3d 391, 394 (5th Cir. 2004).  Although a denial of a defendant's motion for summary judgment is not ordinarily immediately appealable, such a denial based on qualified immunity is a collateral order capable of immediate review.  *Brown v. Strain*, 663 F.3d 245, 248 (5th Cir. 2011) (inset quotation marks omitted).  We have jurisdiction over such an order, however, only "to the extent that the district court's order turns on an issue of law," *Kovacic v. Villareal*, 628 F.3d 209, 211 (5th Cir. 2010); if it turns on a disputed material fact, we lack jurisdiction.  Thus, if we decide that the district court erred in assessing the legal significance of the conduct that the district court considered, we then decide whether the factual disputes are material to deciding the legal issue presented in the summary judgment.  *See Kinney v. Weaver*, 367 F.3d 337, 348 (5th Cir. 2004) (en banc); *Wagner v. Bay City*, 227 F.3d 316, 320 (5th Cir. 2000).  If there are no such material factual disputes, we can then rule on the claim for qualified immunity.

2

No. 11-41359

Ms. Wyatt ("Wyatt"), in her complaint, has made various claims, but in this interlocutory appeal, we only have appellate jurisdiction over the federal claims against the individual defendants Rhonda Fletcher ("Fletcher") and Cassandra Newell ("Newell").[1] Wyatt alleged in her complaint that the coaches' conduct violated her daughter's constitutional right to privacy under the Fourteenth Amendment and her right to be free from unreasonable seizure under the Fourth Amendment. As we will see, to decide the overarching question of whether the district court erred in denying the coaches qualified immunity, we ask whether the Fourth and Fourteenth Amendment rights, which Wyatt claims were violated, are "clearly established." *See Jones v. City of Jackson*, 203 F.3d 875, 879 (5th Cir. 2000) (quoting *Siegert v. Gilley*, 500 U.S. 226, 231 (1991)). If they are not, the appellants are entitled to qualified immunity, and the district court's denial of summary judgment on the federal claims was error.[2]

II.

A.

The dispute arose in the East Texas town of Kilgore. On March 3, 2009, S.W., a student at Kilgore High School ("KHS"), attended a meeting of the varsity softball team on which she played. The meeting was held at an off-campus playing field where practices regularly took place. In her complaint, Wyatt alleges that, upon S.W.'s arrival at the meeting, S.W.'s softball coaches Fletcher and Newell dismissed the rest of the team and led S.W. into a nearby

---

[1] We do not reach Wyatt's claims brought under the *Monell* doctrine against Kilgore Independent School District. *Monell v. Dep't. of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978). Nor are Wyatt's claims against Douglas Duke before us, *see infra* n.9. The only appellants in this case are Fletcher and Newell. To the extent that Wyatt brings state law claims against Fletcher and Newell under the Texas Constitution and Texas common law, those claims are not before us on this appeal.

[2] We stress that our holdings here are narrow: they address only whether the specific constitutional rights in this case are clearly established.

3

locker room, locked the door, and questioned her about an alleged relationship with an older young woman named Hillary Nutt ("Nutt"). Wyatt said that the coaches then yelled at S.W., falsely accused her of spreading rumors regarding one of the coaches' sexual orientation,[3] and threatened to tell S.W.'s mother that her daughter was in a sexual relationship with another woman.[4] In her complaint, Wyatt made a further allegation: that, at the locker room meeting, "Fletcher asked S.W. if she was gay." In her deposition, however, S.W.'s story changed: she said definitively that the coaches did *not* ask, point blank, whether she was a lesbian. Besides this inconsistency, there is one more worthy of note: in her complaint, Wyatt states, "At the time of Fletcher and Newell's confrontation, S.W. was dating [Nutt]." But in her appellate brief, she says "in fact, [S.W.] and Hillary [Nutt] hadn't dated" and "weren't in a relationship."

Following the meeting with S.W., the coaches called Wyatt, S.W.'s mother, and requested they meet.[5] The parties' characterizations of events differ. In her complaint, Wyatt alleges that Fletcher revealed S.W.'s sexual orientation to her

---

[3] The record indicates that S.W. *has admitted* to starting a rumor: in her affidavit, S.W. said that, on the day in question, she speculated on Newell's sexual orientation to another student. Apparently, students began discussing this rumor, notes were passed in class, and a student brought the matter to the coaches' attention. Newell and Fletcher then called the meeting. S.W. also admits to routinely showing up late and using profanity at practice.

[4] Wyatt's central claim is "privacy" in S.W.'s sexual orientation. The undisputed facts, however, indicate that S.W. talked about her sexual orientation with a close friend in 2007, admitted she was gay to "five or six" friends the week before the events in question, wore clothing *she describes* as "society's symbol for gay pride," and "went skipping down the hallway holding hands" with another girl. Although these facts are in no way dispositive in our analysis, we note them because they suggest S.W.'s sexual orientation was not a hermetically sealed secret in the school setting.

[5] In the KHS "Parent Involvement Plan," the school states its position that "the more [KHS] can communicate with parents, the greater success [it] will have in reaching our students. [KHS] want[s] parents involved in all aspects of our school from academics to extracurricular activities." In its "Parent Involvement Policy," KHS states its goal is to "strive to increase parental participation in school and encourage positive interaction between school and home."

mother at this second meeting and that Newell then offered Wyatt the contact information for Nutt.  As with the locker room meeting, however, there are inconsistencies in Wyatt's story.  Wyatt's allegation in her complaint was that, at the second meeting, the coaches "outed" her daughter: "Fletcher said [to Wyatt that] S.W. was a lesbian."  Wyatt apparently withdrew this allegation when, at her deposition, she testified under oath that Coach Fletcher in fact never used the word "gay" or "lesbian."  The claim involving the revelation of S.W.'s sexual orientation has become ever more nuanced over the course of the briefing on this appeal: Instead of alleging that the coaches divulged, point-blank, her daughter's homosexuality, Wyatt's claim is now that she *inferred* S.W.'s sexual orientation from the coaches' comments.[6]  In response, the coaches argue that they were obliged to contact S.W.'s mother because rumors regarding S.W.'s relationship with Nutt were causing dissension on the team, Nutt was a potentially dangerous and underage user of illegal drugs and alcohol, and any possible sexual relationship between Nutt and S.W. was a valid concern.  *See* TEX. PENAL CODE § 22.011(a)(2).[7]

B.

Wyatt filed three separate grievances with Kilgore Independent School District ("KISD") alleging the coaches acted inappropriately by disclosing S.W.'s

---

[6] In her deposition, however, Wyatt testified that she had suspected her daughter was gay prior to the events at issue in this case.

[7] Although, for the purposes of summary judgment, we take the evidence in the light most favorable to Wyatt, *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), we note at the outset of our discussion that the legitimate, disciplinary basis for the coaches' decision to notify Wyatt is established by undisputed facts.  S.W. concedes that she broke multiple team rules, lied to Newell and Fletcher, and discussed Newell's sexuality at school prior to the coaches' decision to notify S.W.'s mother.  Thus, the alleged "bad motives" of the coaches, which the dissent discusses in painful repetition, are incriminatingly tinged by S.W.'s own admissions, which demonstrate her culpability for her conduct of the same sort.

sexual orientation to her mother; all were subsequently dismissed.[8]  Then, on December 10, 2010, Wyatt, as next-friend of her minor daughter S.W., filed a complaint in federal court against KISD, and, in their personal capacities, against KHS assistant athletic director Douglas Duke,[9] Fletcher, and Newell, for violating S.W.'s federal rights under the Fourth and Fourteenth Amendments and state privacy rights under the Texas Constitution.  In their answer, Defendants pleaded the affirmative defense of Texas official immunity for KISD on the state claims and qualified immunity for Fletcher and Newell on the federal claims.  The parties consented to proceed before a magistrate judge, and the coaches moved for summary judgment on the basis of qualified immunity. The magistrate judge rejected the defense of qualified immunity and consequently denied the coaches' motion for summary judgment. The magistrate judge cited "multiple unresolved questions of fact."  With regard to Wyatt's Fourth Amendment claim of unlawful seizure, the court said "there remains a genuine material issue of fact as to whether there was an objectively reasonable basis for the coaches' actions including factual disputes over what transpired behind the closed doors of the locker room."  With regard to the Fourteenth Amendment right to privacy claim, the magistrate judge held that S.W.'s right to privacy in her sexual orientation was clearly established, and summary judgment was premature due to unresolved questions of fact – such as "whether the Coaches[] disclosed S.W.'s sexual orientation as retaliation for S.W.'s conduct, whether they disclosed the identity of Ms. Nutt [to Ms. Wyatt] without

---

[8]  In her original grievance filed with KISD officials, however, Wyatt did not allege Fletcher and Newell had "outed" her daughter but only that the coaches, following the meetings outlined above, improperly removed S.W. from the softball team and that the athletic department failed to respond to Wyatt's queries in a timely fashion.  In short, the claims made by Wyatt have been a constantly moving target.

[9] The court later granted Wyatt's motion to file an amended complaint and voluntarily dismiss Duke from the case; thus, he is not a party in this appeal.

No. 11-41359

provocation by Ms. Wyatt, and the words they used to describe the relationship . . ."– all of which related to the reasonableness of their conduct.

As we have said, we lack appellate jurisdiction in this interlocutory appeal to determine whether a genuine factual issue exists; however, we do have jurisdiction to review the materiality of disputed facts as well as the district court's legal analysis as it pertains to qualified immunity. *See Wagner*, 227 F.3d at 320; *see also Kinney*, 367 F.3d at 358. As we will see, the magistrate judge erred in analyzing the materiality of disputed facts because, even taking the facts in the light most favorable to Wyatt, Wyatt has not alleged violations of clearly established Fourth and Fourteenth Amendment rights. Consequently, we have appellate jurisdiction over this interlocutory appeal.

## III.

Our review of the magistrate judge's legal analysis begins with setting out the standard for qualified immunity. As we have indicated in many prior cases, evaluating qualified immunity is a two-step process, and the burden is on the plaintiff to prove that a government official is not entitled to qualified immunity. *Michalik v. Hermann*, 422 F.3d 252, 258 (5th Cir. 2005). First, we determine whether the plaintiff has alleged a violation of a clearly established constitutional or statutory right. *See Jones*, 203 F.3d at 879. A right is clearly established only if its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Wooley v. City of Baton Rouge*, 211 F.3d 913, 919 (5th Cir. 2000) (inset quotation marks omitted). The applicable law that binds the conduct of officeholders must be clearly established at the time the allegedly actionable conduct occurs. *Id.* (inset quotation marks omitted). If the first step is met (i.e. the official's conduct violates an established right), the second step is to determine whether the

7

defendant's conduct was objectively reasonable.[10]  *Jones*, 203 F.3d at 879 (inset quotation marks omitted).  Both steps in the qualified immunity analysis are questions of law.  *Wooley*, 211 F.3d at 919.

Under the Fifth Circuit standard, the doctrine of qualified immunity protects government officials from civil damages liability when they reasonably could have believed that their conduct was not barred by law, and immunity is not denied unless existing precedent places the constitutional question *beyond debate*.  *Morgan v. Swanson*, 659 F.3d 359, 370-71 (5th Cir. 2011) (en banc).  "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  The law generally disfavors expansive civil liability for actions taken while state officials are on duty because such liability "can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties."  *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  In short, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions."  *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011).

When deciding whether the right allegedly violated was "clearly established," the court asks whether the law so clearly and unambiguously prohibited the conduct that *every* reasonable official would understand that what he is doing violates the law.  *Morgan*, 659 F.3d at 371 (inset quotations omitted).

---

[10] Our analysis does not reach the "second step" of the qualified immunity analysis because, as the discussion that follows will indicate, the first, "clearly established" step has not been met by Wyatt in this case.  Thus, consideration of the "objectively reasonable" prong of qualified immunity is unnecessary.

No. 11-41359

Answering in the affirmative requires the court to be able to point to "controlling authority–or a robust consensus of persuasive authority–that defines the contours of the right in question with a high degree of particularity." *Id.* at 371-72 (citations and inset quotations omitted). This requirement establishes a high bar. When there is no controlling authority specifically prohibiting a defendant's conduct, the law is not clearly established for the purposes of defeating qualified immunity. *See id.* at 372. Acknowledging these clearly drawn bright lines as rigorous background principles of qualified immunity, we proceed to the merits of Wyatt's privacy claim.

## IV.

Wyatt's assertions of federal liability have essentially morphed over the course of the litigation into one primary constitutional claim involving an alleged right to privacy under the Fourteenth Amendment. It is true that, originally, Wyatt alleged two basic claims. In her complaint, Wyatt alleged a Fourth Amendment violation, saying that the coaches' decision to "lock the locker room door and order S.W. to remain inside while Defendants confronted and threatened her was a *de facto* seizure of S.W.'s person . . . ." However, in her appellate brief and at oral argument, Wyatt barely mentioned this seizure allegation. She cites no authorities establishing such a Fourth Amendment violation in school contexts, making practically no effort to show the right in question is "clearly established." When before the district court on summary judgment, however, the district court held there was a genuine issue of material fact relating to her claim of "seizure" – whether there was an objectively reasonable basis for the coaches' actions in the locker room, which, according to S.W., included shouting, intimidating gestures, and locked doors.[11] In so doing,

---

[11] As mentioned earlier, however, S.W. has conceded that she was not asked in the locker room whether she was gay, so, even taking the facts in the light most favorable to S.W., that specific allegation of her Fourth Amendment claim is not before us.

No. 11-41359

however, the court erred; there is no material disputed fact that prevented it from deciding the legal question. First, the district court overlooked case law that establishes that the Fourth Amendment applies differently in the school context and particularly with regard to student athletes in locker rooms. *See Milligan v. City of Slidell*, 226 F.3d 652, 654-55 (5th Cir. 2000); *see also Vernonia School District 47J v. Acton*, 515 U.S. 646, 657 (1995) (noting that "[p]ublic school locker rooms . . . are not notable for the [Fourth Amendment] privacy they afford" and "[b]y choosing to go out for the team, [student athletes] voluntarily subject themselves to a degree of regulation even higher than that imposed on students generally.") (inset quotations omitted).[12] Second, verbal abuse does not give rise to a constitutional violation under 42 U.S.C. § 1983, so any yelling that may have occurred is not actionable. *See Calhoun v. Hargrove*, 312 F.3d 730, 734 (5th Cir. 2002); *see also Doe v. Gooden*, 214 F.3d 952, 955 (8th Cir. 2000) (holding that a teacher's statements, while "demeaning" and "belittling" to his students, did not violate their constitutional rights); *Walker-Serrano by Walker v. Leonard*, 168 F. Supp. 2d 332, 347 (M.D. Pa. 2001) (stating "verbal abuse, whether coming from a student or a teacher, is not a constitutional violation."). Thus, there is simply no clearly established constitutional right – and Wyatt cites none – that protects students from being privately questioned, even

---

[12] The dissent scolds us for citing *Vernonia*, saying the Supreme Court's urinalysis decision has "absolutely nothing to do with the instant case." To be sure, however, *Vernonia* states background principles, cited above, that not only are relevant to the application of the Fourth Amendment in any school athletics context but also support what should be plain: there is nothing *per se* unreasonable about a one-on-one, closed door meeting between coaches and student athletes. As seen in *Milligan*, courts have routinely applied *Vernonia* to contexts other than urinalysis testing. *See* 226 F.3d at 654-55.

No. 11-41359

forcefully, even in a locked locker room.[13] Thus Newell and Fletcher are entitled to qualified immunity on the Fourth Amendment claim.

We are left only with Wyatt's Fourteenth Amendment claim relating to the coaches' conversation with S.W's mother. Under Wyatt's theory, S.W. has a constitutional right to the confidentiality– even with respect to her mother– of her own sexual orientation, which was breached by the coaches when they spoke to her about S.W.'s violations of team policy. In order to further understand the nature of Wyatt's claim – and whether, for purposes of qualified immunity, the right purportedly violated is clearly established, we first briefly consider the modern-day origin and subsequent development of the constitutional right to privacy under the Fourteenth Amendment upon which Wyatt relies.

A.

We begin with *Griswold v. Connecticut,* 381 U.S. 479 (1965). There, the Supreme Court declared that a state law prohibiting the use of contraceptives by married couples was unconstitutional because it violated the right to privacy, a right long last apparent from the penumbra of rights established by the Bill of Rights and applied to the States by the Due Process Clause of the Fourteenth Amendment. *See id.* at 485-86. The decision can be said to have validated an earlier dissent by Justice Brandeis in *Olmstead v. United States*, which described the "right to be let alone" as the "most comprehensive of rights and the right most valued by civilized man." 277 U.S. 438, 478 (1928). In order to protect the right, Justice Brandeis wrote, in dissent, "every unjustifiable

---

[13] Wyatt does not make any allegation of physical restraint, instead stressing what does not sound like a Fourth Amendment claim at all: that her daughter was "bullied into revealing private information." S.W. admits she was never asked by coaches whether she was homosexual, so the "information" Wyatt claims she was forced to reveal is never expressly stated but seems to involve her interactions with Nutt, with whom she expressly denies being in a relationship at the relevant time. *See supra* Part II. The Fourth Amendment claim thus stumbles, then falls.

11

No. 11-41359

intrusion of the government upon the privacy of an individual . . . must be deemed a [constitutional] violation . . . ." *Id.*

Later, in *Whalen v. Roe*, the Supreme Court identified two separate interests that fall under the constitutional right to privacy. 429 U.S. 589, 599-600 (1977). The one of relevance to us is the "individual interest in avoiding disclosure of personal matters" by the government. *Id*. at 599; *see also Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 457 (1977) ("One element of privacy has been characterized as 'the individual interest in avoiding disclosure of personal matters . . . .'"). This confidentiality interest has been defined as "the right to be free from the government disclosing private facts about its citizens." *Ramie v. City of Hedwig Village, Tex.*, 765 F.2d 490, 492 (5th Cir. 1985).

Since *Whalen* and *Nixon*, however, the Supreme Court "has said little else on the subject of an individual interest in avoiding disclosure of personal matters." *NASA v. Nelson*, 131 S. Ct. 746, 756 (2011) (noting that "no other decision has squarely addressed a constitutional right to informational privacy."). Wyatt argues, however, that the Fifth Circuit has "addressed the contours" of her right to privacy and that the constitutional protection accorded to such a right "in this and other circuits is clear." But, in so doing, she overstates the degree to which precedent supports her particular claim. The Fifth Circuit has never held that a person has a constitutionally-protected privacy interest in her sexual orientation, and it certainly has never suggested that such a privacy interest precludes school authorities from discussing with parents matters that relate to the interests of their children. Indeed, we have said, "There is *no* Fifth Circuit authority on what types of disclosures are personal enough to trigger the protection of the confidentiality branch." *Zaffuto v. City of Hammond*, 308 F.3d 485, 490 (5th Cir. 2002) (emphasis added). Therefore, when the magistrate judge in this case held that there is a constitutional right that bars the unauthorized disclosure by school coaches of

No. 11-41359

a student's sexual orientation to the student's mother, he proclaimed a new rule of law.[14]

## B.

## 1.

And although Wyatt argues that the distinct contours of her asserted right were well-established, she can only cite two irrelevantly remote Fifth Circuit cases in an attempt to buttress her claim, *Fadjo v. Coon*, 633 F.2d 1172 (5th Cir. 1981), and *ACLU of Miss., Inc. v. Miss.*, 911 F.2d 1066 (5th Cir. 1990), neither of which even touch on privacy rights between a student and a parent. The first,

---

[14] The dissent gives this error cloud cover and, in so doing, proceeds to miscomprehend the qualified immunity analysis that is fundamental to deciding this case. The Supreme Court "has repeatedly told courts . . . not to define clearly established law at a high level of generality." *al-Kidd*, 131 S. Ct. at 2084. Here, the district court and now, apparently, the dissent have redacted this directive from Supreme Court authority. They have allowed their analysis to hinge on the existence of a Fourteenth Amendment general right to privacy and the general possession of that right by some minors in some limited circumstances. As we observe *supra* herein, the existence of a general right is established, and we do not take issue with it. In order for liability to be imposed on public officials, however, qualified immunity cases require more than a bare allegation of a general right to nondisclosure of private information: "the right the official is alleged to have violated must have been 'clearly established' in a *more particularized*, and hence more relevant, sense." *Anderson*, 483 U.S. at 640 (emphasis added). Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of [] abstract rights." *Id.* at 639. The following two examples illustrate the dissent's errant approach: for the Supreme Court, "[t]he general proposition . . . that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of *particular conduct* is clearly established." *al-Kidd*, 131 S. Ct. at 2084 (emphasis added). Similarly, "[T]he right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause . . . violates a clearly established right . . . ." *Morgan*, 659 F.2d at 372. But that does not mean liability will be imposed on public officials, for the question is "whether that right has been defined *with sufficient clarity*" and specificity "to enable a reasonable official to assess the lawfulness of his conduct." *Id.* (emphasis added). The central concept is fair warning: "qualified immunity should not be denied unless the law is clear *in the more particularized sense* that reasonable officials should be on notice that their conduct is unlawful." *Kinney*, 367 F.3d at 350 (emphasis added) (inset quotation marks omitted). There is no authority – and none has been cited – that would put school officials on notice that specific conversations between a teacher and a parent regarding a student's conduct are barred.

*Fadjo v. Coon*, concerned disclosure of an insurance beneficiary's personal information in the context of a criminal investigation. 633 F.2d at 1174. Plaintiff Fadjo was the named beneficiary of life insurance policies insuring a man who mysteriously disappeared. *Id*. at 1174. After explicit assurances by the state attorney that his testimony would be absolutely privileged, Fadjo, as part of the criminal investigation, provided the state with information concerning "the most private details of his life." *Id*. The state attorney then shared this information with insurance companies, resulting in personal misfortune to Fadjo, who was forced to move his residence and struggled to find meaningful employment. *Id*. Finding that Fadjo's right to privacy had been violated by the disclosure, the court held that there was an actionable § 1983 claim under the confidentiality branch of the Fourteenth Amendment[15] and that "no legitimate state purpose existed sufficient to outweigh the invasion into Fadjo's privacy." *Id*. at 1175. Notably, the court never discussed the specific nature of the "private details of Fadjo's life" that were disclosed (i.e. details private enough to warrant constitutional protection), and the court never suggested that sexual orientation might be one of them. Furthermore, the court stressed that Fadjo had been promised that the information he provided investigators would be confidential and that the plaintiff's allegation was that the state had not honored this pledge. *Id*. at 1176 (stating "Fadjo's case is distinguishable . . . since it involves the revelation of intimate information obtained under a *pledge of confidentiality* . . . .") (emphasis added). In Wyatt's case, the coaches made no such promise to S.W.

---

[15] The court, however, did not perform a detailed qualified immunity analysis. We note in passing that *Fadjo* was decided before several noteworthy Supreme Court cases on qualified immunity, among them, *Siegert,* 500 U.S. 226; *Saucier v. Katz*, 533 U.S. 194 (2001); *Hope v. Pelzer*, 536 U.S. 730 (2002); *Brousseau v. Haugen*, 543 U.S. 194 (2004); and *Pearson,* 555 U.S. 223.

No. 11-41359

Even to speculate that an established right to the non-disclosure of one's sexual orientation exists does not help Wyatt's case and *still* does not result in liability for the coaches. This is so because such speculation does not establish specifically that school officials are barred from communicating with parents regarding minor students' behavior and welfare, when doing so might cause the parents to infer their child's sexual orientation.

The second Fifth Circuit case Wyatt relies upon is *American Civil Liberties Union of Miss., Inc. v. Mississippi*, 911 F.2d at 1066. That case concerned the dismantling of a state agency whose purpose was to perpetuate racial segregation. *Id*. at 1068. After the agency had been shut down, the district court ordered that all agency files, including some containing sensitive, personal information of civil rights activists, be released to the general public. *Id*. This court reversed. We held that the public interest in full disclosure of the files was outweighed by the privacy concerns of the individuals whose information was obtained without permission.[16] *Id*. at 1069. In the passage most relevant to the case at bar, the court said that plaintiffs "undeniably have an interest in restricting the disclosure of information" regarding "numerous instances of (often unsubstantiated) *allegations of homosexuality*, child molestation, illegitimate births, and sexual promiscuity . . . ." *Id*. (emphasis added).

---

[16] In *ACLU of Miss.*, the court in its discussion repeatedly pointed to clearly established rights – the right of a free press to publish matters of public concern, the public's right to access certain government documents, and individuals' right to suppress information the government gathered unlawfully – and then weighed the parties' competing interests in privacy and disclosure. *Id*. at 1070-73. This balancing of interests standard is appropriate in a qualified immunity case like ours only if, first, the plaintiff claims a violation of clearly established law. *See, e.g. Sterling v. Borough of Minersville*, 232 F.3d 190, 193-96 (3d Cir. 2000) (stating that courts first ask whether plaintiff "had a protected privacy right," then, if it exists, "whether it was clearly established at the time of its alleged violation," and finally whether there is a "legitimate [government] interest that can override the protections of the right to privacy.") For the reasons discussed *infra* herein, Wyatt has not shown the existence of a clearly established privacy right, so we do not conduct the balancing of interests.

Importantly, *ACLU of Miss.* was an appeal of a district court's granting of complete public disclosure of agency files and thus did not involve the qualified immunity framework fundamental to deciding this interlocutory appeal. The analysis in *ACLU of Miss.* also focused in part on First Amendment concerns not relevant in S.W.'s case, saying that "to the extent that [the] information [in the agency files] is a matter of public concern, any public need to know could be satisfied by release of the information in a more limited format." *Id.* at 1071. Although the public undoubtedly had an interest in obtaining information about the defunct, anti-civil rights agency, the public's interest could not prevail over the plaintiffs' right to privacy because the public interest could be addressed by this option of selective disclosure. The *ACLU of Miss.* court also emphasized that the personal information at issue was originally gathered by unconstitutional means (illegitimate searches and seizures by segregationist agency officials) pursuant to an unconstitutional purpose (suppressing speech of civil rights activists contrary in viewpoint to the agency), suggesting the court was further motivated by fairness concerns inherent in the public release of private information the government never had a right to possess in the first place. *Id.* at 1070.

Although the selective disclosure and fairness considerations in *ACLU of Miss.* are not analogous to the student-teacher-parent concerns in S.W.'s case, it is appropriate to point out that the "disclosure" here was only to the student's mother; it was not discussed with other coaches, teachers, or students. Further, instead of bluntly declaring her daughter to be a homosexual, it is undisputed that the coaches mentioned to Wyatt only that S.W. was in a possibly inappropriate relationship with Nutt – thus narrowly tailoring the disclosure to the mother's "need to know." Second, unlike the facts in *ACLU of Miss.*, the government here was not illegally and secretly collecting information in order to do harm to private citizens; disclosure of S.W.'s relationship was in the

No. 11-41359

interest of the student and became necessary only after S.W., allegedly influenced by Nutt, violated team rules and policy, which were in place for the benefit and safety of students.

In summary, then, when we consider *ACLU of Miss.* and *Fadjo*, neither is established – much less *clearly* established – authority for the claims presented here. It is of major significance that neither occurred in the context of public schools' relations with their students and the students' parents. We therefore hold there is no controlling Fifth Circuit authority – certainly not with "sufficient particularity" – showing a clearly established Fourteenth Amendment privacy right that prohibits school officials from communicating to parents information regarding minor students' interests, even when private matters of sex are involved. *See Morgan*, 659 F.3d at 372.

2.

Nor from outside the circuit do we find a "robust *consensus* of persuasive authority" that such a right was clearly established. *Id*. (emphasis added). In her attempt to draw help from outside friends, Wyatt calls on the Third Circuit. *Sterling v. Borough of Minersville*, she argues, stands for the proposition that there is a clearly established privacy right in one's sexual orientation. 232 F.3d 190 (3d Cir. 2000). There, a police officer discovered two male teenagers in a parked car at night and threatened to disclose to one of the teenager's relatives the secret that the teenager was a homosexual. *Id*. at 192. The threat allegedly resulted in the teenager's committing suicide. *Id*. In affirming an order denying summary judgment on qualified immunity grounds, the Third Circuit held that public disclosure by the government of a plaintiff's sexual orientation can give rise to a constitutional claim for the violation of privacy. *Id*. at 196. Because there was a clearly established right to privacy in the Third Circuit, the defendants were not entitled to qualified immunity. *Id*. at 196-98.

17

No. 11-41359

The *Sterling* decision is notable in several respects.  First, it is not controlling authority in this case and, thus, its reasoning, standing alone, is not dispositive for us today.  Second, the deceased victim was not a minor, and the court noted this fact when it acknowledged that "because [plaintiff] *was 18*, there was no reason for [the officer] to interfere with [plaintiff's] family's awareness of his sexual orientation."  *Id.* at 197-98 (emphasis added).  This observation suggests that the *Sterling* court may have considered a situation involving a minor, differently.  Third, although *Sterling* held that the law regarding the disclosure of one's sexual orientation was "clearly established," at least in the Third Circuit, in 1997, the court's justifications for its doing so are dubious: cases from within the circuit that dealt with private medical and financial information and precedent from outside the circuit that was, at best, unclear on the issue. *Id.* at 195-96; *cf.*, *id.* at 198, 199 n.3 (Stapleton, J., dissenting) ("[A] person's right to privacy in his or her sexual orientation simply was not clearly established in April of 1997" because, for example, "[t]he Fourth Circuit's decision in [*Walls v. City of Petersburg*, 895 F.2d 188, 193 (1990)] addressed the issue squarely . . . and reached the opposite conclusion . . . .").  Since *Sterling*, the Supreme Court has repeatedly admonished courts to avoid finding "clearly established" law through such a loose method; looking to precedent that is, at best, inconclusive, and, at worst, irrelevant, as *Sterling* did, simply no longer suffices.  *See*, *e.g. Brousseau v. Haugen*, 543 U.S. 194, 198-201 (2004) (holding that, when none of a "handful" of cases "squarely govern" the specific factual circumstances in a § 1983 suit, the cases do not clearly establish – in the mandatory "particularized sense" – a right that was violated).

In our case today, the trial court cited other cases from outside the circuit on its way to denying summary judgment to the coaches.  Perhaps the most salient distinguishing factor in all these cases is that none occurred in a school context; together, they establish only the simple and unsurprising proposition

18

that individuals generally can have a privacy interest in some personal "sexual matters," a broad, general proposition with which we do not take issue.[17]  None of these cases approximate the factual context we have before us, and none of them provide any guidance regarding the crucial question: whether a student has a privacy right under the Fourteenth Amendment that forbids school officials from discussing student sexual information during meetings with parents.[18]

In sum, then, we hold that Wyatt has not alleged a clearly established constitutional right – drawn either from the Supreme Court's jurisprudence, from our own precedent or from that of other circuits – that the coaches

---

[17] The Second Circuit case, *Powell v. Schriver*, provides modest support for the existence of a privacy right to medical information. 175 F.3d 107, 112 (2d Cir. 1999) ("Individuals who are transsexuals are among those who possess a constitutional right to maintain medical confidentiality.")  The Third Circuit case, *Sterling*, is discussed above.  232 F.3d 190.  The Sixth Circuit case found that a victim's interest in preventing dissemination of intimate details of a rape implicates a fundamental right but that the public official who released those details to the public was nonetheless entitled to qualified immunity. *Bloch v. Ribar*, 156 F.3d 673, 686-87 (6th Cir. 1998).  The Ninth Circuit case held that a woman who applied to work for a local police department had an interest in the nondisclosure, throughout the application process, of her sexual history but emphasized that "considering the sexual morality of [] employees" is not *per se* prohibited by the Constitution. *Thorne v. City of El Segundo*, 726 F.2d 459, 468-70 (9th Cir. 1983).  Finally, the Tenth Circuit case quotes *Thorne*, the Ninth Circuit case, to establish essentially the same proposition. *Eastwood v. Dept. of Corrections*, 846 F.2d 627, 631 (10th Cir. 1988).

[18] The dissent criticizes our approach for not weighing S.W.'s interest against the school's.  Because this is a qualified immunity case, a balancing of interests requires a clearly established right.  We find no evidence of the existence of such a right; thus, we cannot reach the question of whether the school's interest outweighed S.W.'s.  Obviously, if there is no clearly established right to begin with, we cannot "balance" it against anything.

No. 11-41359

violated.[19] The magistrate judge, therefore, erred in denying qualified immunity to each of the defendants on each of the federal claims.

V.

To summarize our opinion today: we hold that the magistrate judge erred in denying Newell and Fletcher summary judgment on the claims of qualified immunity. It was error because there is no Supreme Court or Fifth Circuit case that clearly establishes or even suggests that a high school student has a Fourth Amendment right that bars the student from being questioned by coaches in a locker room or a Fourteenth Amendment right to privacy that bars a teacher or coach from discussing the student's private matters with the student's parents. Fletcher and Newell were entitled to qualified immunity for this suit with respect to the federal claims, because, based on undisputed facts, there was no violation of a clearly established federal right. *Jones*, 203 F.3d at 879. For the above reasons, the judgment is reversed and vacated with respect to all federal claims against the individual defendants, and the case is remanded for entry of the appropriate judgment not inconsistent with this opinion.

REVERSED and VACATED in part, and
REMANDED for entry of judgment.

---

[19] The dissent chides us for "fail[ing] to provide any authority for [our] finding that the right to privacy in personal sexual matters does not extend to high school students." We make no such finding; we only conclude that such a right is not clearly established. Furthermore, as noted *supra* herein, the burden is not on us to find authority for Wyatt's position. In qualified immunity cases, "the plaintiff bears the burden of proving that a government official is not entitled to qualified immunity." *Michalik*, 422 F.3d at 258. When a public official, like Newell and Fletcher here, pleads good faith, "the burden [shifts] to the plaintiff, who must rebut the defense by establishing that the officer's allegedly wrongful conduct violated clearly established law." *Id*. at 262. Wyatt simply has not met her burden.

No. 11-41359

GRAVES, Circuit Judge, dissenting.

I disagree with the majority's finding that high school students have no clearly established rights under the Fourteenth and Fourth Amendments. Because I would affirm the district court's denial of qualified immunity to coaches Cassandra Newell and Rhonda Fletcher, I respectfully dissent.

## Factual History

S.W. was a 16-year-old softball player at Kilgore High School (KHS) in Texas. S.W., who had told only a few friends that she was gay, became involved in a relationship with 18-year-old Hillary Nutt. The softball coaches, Newell and Fletcher, claimed that they had heard a rumor[1] that S.W. had told someone she was involved in a relationship with Nutt and that Nutt was Newell's ex-girlfriend. Newell is gay and admitted in her deposition that Nutt started attending softball games after being invited by Newell's former girlfriend.

Upon hearing this rumor, the coaches decided to confront S.W. They arranged an off-campus meeting after school on March 3, 2009. During this meeting, the coaches locked S.W. in the softball locker room and aggressively questioned her at length about her relationship with Nutt, her sexual orientation, and whether she had told anyone about Newell's alleged relationship with Nutt. S.W. indicated that she was afraid and sat on a beanbag chair with her arms wrapped around her knees, while the coaches

---

[1] The majority erroneously states that S.W. admitted to starting a rumor. S.W. did not admit to starting any rumor. S.W. admitted to having a "private conversation with one person" after that person pressed S.W. for an opinion on Newell's sexuality. Further, there is no dispute that Newell is gay and brought her girlfriend to softball games. With regard to extraneous "facts," S.W. did not admit to "routinely showing up late and using profanity at practice." S.W. admitted to being required to run for being late and/or using profanity when she accidentally hit herself in the kneecap with a bat "maybe two or three" times in 2009, which is the time period in question. However, there is absolutely no claim by the coaches that they met with Wyatt to discuss S.W. being late or using profanity, minor team infractions for which S.W. had already been punished along with other players.

21

sat on their knees.  At one point, Fletcher raised up, towering over S.W., and yelled at her.  Fletcher asked S.W. if she was having a relationship with Nutt. While S.W. did say in her deposition that the coaches did not use the word "lesbian," she said in her declaration that they asked if she was gay.  S.W. also said that the coaches got very angry, repeatedly called her a "liar," threatened her, and made intimidating gestures to the point that she thought Fletcher might hit her.

The coaches then called S.W.'s mother, Barbara Wyatt, arranged a meeting with her a short time later, and disclosed to her that S.W. was having an inappropriate relationship with another female.  The coaches also revealed the identity of S.W.'s "girlfriend" to Wyatt, who was unaware that S.W. was gay.[2]  Wyatt testified in her deposition that, although she had suspected that S.W. may be gay, S.W. had always denied it to her.

The coaches then refused to discuss the matter further.  S.W. was later removed from the softball team.  Wyatt attempted to resolve the situation through school officials and then by filing official complaints, which were denied.  Subsequently, Wyatt filed an action in district court, asserting that the coaches violated S.W.'s  privacy rights under the Fourth and Fourteenth Amendments and under the Texas Constitution.  The coaches filed a motion for summary judgment on the basis of qualified immunity.  The district court denied the motion, and the coaches filed an interlocutory appeal.  The majority states that Wyatt's claim has "become ever more nuanced" and that

---

[2] Contrary to the majority's statement in footnote 4 regarding "undisputed" facts, while S.W. admitted that she had confided in some friends regarding her sexual orientation, it is undisputed that she had never told her mother.  With regard to "skipping down the hallway holding hands," S.W. was asked during her deposition if she had "ever held hands in the hallway with a girl."  S.W. responded that she and two other girls had held hands and skipped down the hallway, but clarified twice that it was nothing homosexual.  The clothing representing "society's symbol for gay pride" was a belt with studs on it forming the shape of a rainbow that S.W. had worn twice over a few-months' time.

No. 11-41359

her "claim is now that she *inferred* S.W.'s sexual orientation from the coaches' comments." In fact, Wyatt has consistently maintained that the coaches told her S.W. was dating a girl and characterized Nutt as S.W.'s "girlfriend."

**Standard of Review**

As correctly stated by the majority, this court reviews de novo a district court's denial of a motion for summary judgment on the basis of qualified immunity. *Kovacic v. Villarreal*, 628 F.3d 209, 211 (5th Cir. 2010). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The denial of a motion for summary judgment on the basis of qualified immunity is immediately appealable, to the extent that it turns on an issue of law. *Kovacic*, 628 F.3d at 211. The limitation of the interlocutory appellate jurisdiction to questions of law prohibits this court's consideration of the correctness of plaintiff's version of the facts. *Good v. Curtis*, 601 F.3d 393, 397 (5th Cir. 2010).

> This means that the district court's finding that a genuine factual dispute exists is a factual determination that this court is prohibited from reviewing in this interlocutory appeal. But the district court's determination that a particular dispute is material is a reviewable legal determination. Thus, a defendant challenging the denial of a motion for summary judgment on the basis of qualified immunity must be prepared to concede the best view of the facts to the plaintiff and discuss only the legal issues raised by the appeal.

*Id.* at 397-98. (Internal marks, citations and emphasis omitted).

The majority erroneously fails to concede the best view of the facts to the plaintiff, apparently under this Court's authority to decide whether the factual disputes are material to deciding the summary judgment. *Wagner v. Bay City*, 227 F.3d 316, 320 (5th Cir. 2000). While it is correct that we can

No. 11-41359

review the materiality of factual disputes, we must keep in mind what this Court said in the excessive force case of *Wagner*.  There, this Court said:

> In deciding an interlocutory appeal of a denial of qualified immunity, we can review the materiality of any factual disputes, but not their genuineness. *See Colston v. Barnhart*, 146 F.3d 282, 284 (5th Cir.) (on petition for rehearing en banc), cert. denied, 525 U.S. 1054, 119 S.Ct. 618, 142 L.Ed.2d 557 (1998). So, we review the complaint and record to determine whether, assuming that all of Wagner's factual assertions are true, those facts are materially sufficient to establish that defendants acted in an objectively unreasonable manner. Even where, as here, the district court has determined that there are genuine disputes raised by the evidence, we assume plaintiff's version of the facts is true, then determine whether those facts suffice for a claim of excessive force under these circumstances.

*Wagner*, 227 F.3d 320.  Rather than weigh Wyatt's version of the facts and compare it to the coaches' version, this Court must decide whether the facts as presented by Wyatt are materially sufficient to establish that the coaches acted in an objectively unreasonable manner.

## Qualified Immunity

When a defendant moves for summary judgment on the basis of qualified immunity, the court must decide: 1) Whether the facts made out a violation of a constitutional right; and 2) whether that right was "clearly established" at the time of the defendant's alleged misconduct so that a reasonable official in the defendant's situation would have understood that his conduct violated that right.  *See Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379 (5th Cir. 2009).  *See also Brewer v. Wilkinson*, 3 F.3d 816 (5th Cir. 1993).

## Right of Privacy

With regard to the Fourteenth Amendment right to privacy violation, the district court found that there is a constitutional right to prevent the

unauthorized disclosure of one's sexual orientation, and cites various cases from this Circuit and beyond in support of such a proposition. I agree with the district court's analysis.

The majority acknowledges that the United States Supreme Court has recognized an individual interest in avoiding the disclosure of personal matters, but then finds that Wyatt has failed to allege a clearly established constitutional right. There is no dispute that one's sexual orientation is a personal matter. The majority attempts to distinguish the cases cited by the district court and Wyatt on the basis that none occurred in the school context. However, the majority ultimately concedes that individuals have a privacy interest in personal sexual matters. *See Whalen v. Roe*, 429 U.S. 589, 599, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). *See also Fadjo v. Coon*, 633 F.2d 1172 (5th Cir. 1981), and *ACLU v. State of Miss.*, 911 F.2d 1066, 1070 (5th Cir. 1990). But, as discussed more fully herein, the majority then finds that any such right does not extend to high school students.

At least five other circuits have recognized a right of privacy regarding personal sexual matters. *See Sterling v. Borough of Minersville*, 232 F.3d 190, 196 (3d Cir. 2000) ("It is difficult to imagine a more private matter than one's sexuality and a less likely probability that the government would have a legitimate interest in disclosure of sexual identity.")("We can, therefore, readily conclude that Wayman's sexual orientation was an intimate aspect of his personality entitled to privacy protection under *Whalen*."); *Powell v. Schriver*, 175 F.3d 107, 111 (2nd Cir. 1999)("We conclude that the reasoning that supports the holding in Doe compels the conclusion that the Constitution does indeed protect the right to maintain the confidentiality of one's transsexualism."); *Bloch v. Ribar*, 156 F.3d 673, 685-86 (6th Cir. 1998) ("Our sexuality and choices about sex, in turn, are interests of an intimate nature which define significant portions of our personhood. Publically revealing

information regarding these interests exposes an aspect of our lives that we regard as highly personal and private. Indeed, for many of these reasons, a number of our sister circuits have concluded that information regarding private sexual matters warrants constitutional protection against public dissemination.”); and *Thorne v. City of El Segundo*, 726 F.2d 459, 468 (9th Cir. 1983) (“The interests Thorne raises in the privacy of her sexual activities are within the zone protected by the constitution. This conclusion follows from the cases holding that such basic matters as contraception, abortion, marriage, and family life are protected by the constitution from unwarranted government intrusion.”); and *Eastwood v. Dept. of Corrections*, 846 F.2d 627, 631 (10th Cir. 1988) (“As in Thorne, plaintiff in the instant case was forced to answer a number of irrelevant and embarrassing questions. . . .   Indications of a victim's promiscuity are not probative of either credibility or consent to sexual advances. . . .   Nor should such an inquiry be sanctioned in this case.”). While this authority may not be controlling, it is certainly persuasive.

Significantly, the majority fails to provide any authority for its finding that the right to privacy in personal sexual matters does not extend to high school students.  To the contrary, the Supreme Court has found that the constitutional right to privacy extends to minors. *See Application of Gault*, 387 U.S. 1, 13, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).  The question is then whether minors lose that right upon entering the schoolhouse gate.  The only cases cited by the majority, albeit in the Fourth Amendment analysis, regarding high school students do not support the majority's finding that the right to privacy does not extend to high school students. *See Vernonia School District 47J v. Acton*, 515 U.S. 646, 655-56 (1995) and *Milligan v. City of Slidell*, 226 F.3d 652, 654-55 (5th Cir. 2000), discussed more fully herein.

Based on the applicable case law set out above, there clearly exists a right to privacy regarding one's sexual orientation.  The findings of the

No. 11-41359

United States Supreme Court and six Circuit Courts of Appeal (including the 5th) that information of a sexual nature is intrinsically private is more than a "simple and unsurprising proposition." Additionally, the school context does not defeat the very existence of a right, but rather comes into play with regard to a balancing test and whether the government's interest outweighs a student's privacy right. "Thus, while children assuredly do not 'shed their constitutional rights . . . at the schoolhouse gate,' the nature of those rights is what is appropriate for children in school." *Vernonia*, 515 U.S. at 655-56 (internal citations omitted). Based on the applicable authority and the coaches' own admissions that they recognized the private nature of the information, the district court is absolutely correct that sexual orientation would fall within the categories of highly personal information protected by the right to privacy. The district court correctly held that, while the 5th Circuit has never explicitly held that a student has a right to privacy in keeping his or her sexual orientation confidential, an analysis of precedent compels the finding of such a right.

The question then becomes whether the coaches had a legitimate interest which outweighed S.W.'s right to privacy. *See Fadjo*, 633 F.2d at 1176. *See also Vernonia*, 515 U.S. at 656-57. The majority does not reach this balancing test, finding that consideration of the objectively reasonable prong of qualified immunity is unnecessary. However, this prong is necessary to determine whether the coaches' interests outweigh a student's right to privacy.

In support of a legitimate State interest, the coaches assert various reasons, including the possible sexual assault of a minor under Texas statute, Nutt being a bad influence, a violation of rules for S.W. riding with Nutt, and team discipline. Both the law and the facts undermine the legitimacy of the reasons given by the coaches. The Texas statute referred to by the majority

27

No. 11-41359

specifically provides an affirmative defense because S.W. was over 14 and there was only two-years age difference between S.W. and Nutt. Thus, there was likely no valid legal concern regarding sexual assault.

With regard to Nutt being a bad influence, after indicating during her deposition that she did not know of Nutt ever doing drugs, S.W. was asked, "[y]ou don't know whether or not Hillary Nutt has ever taken a sip of alcohol?" S.W. responded that she knew Nutt had taken a drink but never in her presence. Also, S.W. was not asked if she knew where Nutt had taken that "sip of alcohol" or the applicable drinking age of the location. Further, Coach Newell testified a resounding "No" when asked during her deposition, "So, just to clarify, did you consider Hillary Nutt, the woman that your girlfriend invited to see your team members play, to be a threat to any of your – any of the players on your team ever?" Thus, there is no indication that Nutt was "potentially dangerous" or an "underage user of illegal drugs and alcohol."

The claim of S.W. violating a team rule for riding with Nutt is also unsupported by the facts. The team rule involves a permission slip that pertains to, inter alia, in-school transportation by other softball players between 6th and 7th periods for practice. Nutt was not listed on the permission slip. However, the permission slip does not regulate riding with anyone outside of softball. To construe this permission slip to apply to drivers not on the softball team is erroneous and would mean that neither Wyatt nor S.W.'s grandmother would have ever been able to transport S.W. because neither are listed on the permission slip. Yet, the coaches repeatedly said both Wyatt and the grandmother could also transport S.W.

As to team dissension caused by rumors of S.W.'s involvement with Nutt, we are, again, bound by S.W.'s facts - that she did not spread any rumors. Further, the coaches could not have known of any alleged dissension

28

as this alleged "rumor" did not come to light until March 3, the day the coaches interrogated S.W. and revealed her sexual orientation to her mother. But the coaches dismissed the rest of the softball team prior to the "meeting" with S.W.  Also, the allegation regarding dissension emanates from the coaches' version of the facts.

More importantly, the only thing the coaches knew prior to interrogating S.W. was a rumor that she had allegedly told someone that she was in a relationship with Nutt and that Nutt was Newell's ex-girlfriend. There was no evidence that S.W. was actually in a relationship with Nutt, that it was a sexual relationship, that S.W. lied about anything or had ever ridden with Nutt.  The coaches did not find out that S.W. was actually involved in a relationship, albeit apparently never sexual, with Nutt until they interrogated S.W.  The record indicates that the coaches also did not find out that S.W. was riding with Nutt until after they met with S.W.  Moreover, Fletcher admitted as much in her deposition when she testified that the coaches called Wyatt to the field because they wanted her to help stop the spreading of rumors about Newell and because S.W. was "dating" an "adult."

The district court fully considered all of the above and found that there was sufficient evidence from which a reasonable person could conclude that the coaches were not motivated by the need to protect S.W. but rather were retaliating against S.W. for allegedly spreading a rumor about Newell.  The State has no interest in retaliating against students. As the district court found, even if the coaches were motivated by a desire to protect S.W., Wyatt provided expert testimony that the coaches' actions "were not a reasonable response to any potential concerns they may have had regarding S.W. or her welfare."  The district court further found that, based on the record, it could not find that the States' interest outweighed S.W.'s right to keep her sexual orientation confidential, and that S.W.'s rights were clearly established at the

time.  The district court also found that there were substantial unresolved questions of fact surrounding the circumstances leading up to the confrontation and the content of the coaches conversation with Wyatt that prevent it from making a qualified immunity determination.  "Without a factual determination by the appropriate trier of fact, this Court cannot resolve the legal question as to whether the Defendants' actions are amenable to a qualified immunity defense on this claim," concluded the district court.  I agree.

## Unreasonable Seizure

With regard to the Fourth Amendment claim based on the confrontation in the locker room, the majority says that the district court overlooked case law that establishes that the Fourth Amendment applies differently in the school context and particularly with regard to student athletes in locker rooms.  Again, the majority cites *Vernonia,* 515 U.S. 646, and *Milligan*, 226 F.3d 652, for the diminished expectation of privacy of school children, particularly student athletes.  However, neither case supports any such finding.

*Vernonia* was a case involving random urinalysis drug testing of student athletes.  The majority cites this case for the proposition that athletes have less privacy expectations and that locker rooms are "not notable for the [Fourth Amendment] privacy they afford."  *Vernonia*, 515 U.S. at 657.[3]  But those propositions have absolutely nothing to do with the instant case.  The Supreme Court specifically said:

---

[3] The majority asserts that the seizure behind locked doors was proper because, by choosing to be a student athlete, S.W. subjected herself to a higher degree of regulation, but then cites *Milligan* for the proposition that actually being a student athlete has nothing to do with it.  I note that *Milligan* involved questioning of students by police officers regarding possible illegal acts, i.e., fights involving weapons.

No. 11-41359

> While we do not, of course, suggest that public schools as a
> general matter have such a degree of control over children as to
> give rise to a constitutional "duty to protect," we have
> acknowledged that for many purposes "school authorities ac[t] in
> loco parentis," with the power and indeed the duty to "inculcate
> the habits and manners of civility,"  Thus, while children
> assuredly do not "shed their constitutional rights ... at the
> schoolhouse gate," the nature of those rights is what is
> appropriate for children in school.

*Vernonia*, 515 U.S. at 655.  (Internal citations, marks omitted).  The Court further said:

> Legitimate privacy expectations are even less with regard to
> student athletes. School sports are not for the bashful. They
> require "suiting up" before each practice or event, and showering
> and changing afterwards. Public school locker rooms, the usual
> sites for these activities, are not notable for the privacy they
> afford. The locker rooms in Vernonia are typical: No individual
> dressing rooms are provided; shower heads are lined up along a
> wall, unseparated by any sort of partition or curtain; not even all
> the toilet stalls have doors. As the United States Court of Appeals
> for the Seventh Circuit has noted, there is "an element of
> 'communal undress' inherent in athletic participation."

*Vernonia*, 515 U.S. at 657.  (Internal citations omitted).  This case has nothing to do with physical privacy in a locker room or even compliance with established rules such as random drug testing.  That said, even conceding a diminished expectation of privacy, the Court's further analysis regarding random drug testing is telling:

> Having considered the scope of the legitimate expectation of
> privacy at issue here, we turn next to the character of the
> intrusion that is complained of. We recognized in Skinner that
> collecting the samples for urinalysis intrudes upon "an excretory
> function traditionally shielded by great privacy." We noted,
> however, that the degree of intrusion depends upon the manner
> in which production of the urine sample is monitored. . . .  These
> conditions are nearly identical to those typically encountered in
> public restrooms, which men, women, and especially
> schoolchildren use daily. Under such conditions, the privacy

31

interests compromised by the process of obtaining the urine sample are in our view negligible.

The other privacy-invasive aspect of urinalysis is, of course, the information it discloses concerning the state of the subject's body, and the materials he has ingested. In this regard it is significant that the tests at issue here look only for drugs, and not for whether the student is, for example, epileptic, pregnant, or diabetic. Moreover, the drugs for which the samples are screened are standard, and do not vary according to the identity of the student. And finally, the results of the tests are disclosed only to a limited class of school personnel who have a need to know; and they are not turned over to law enforcement authorities or used for any internal disciplinary function.

*Vernonia*, 515 U.S. at 658. (Internal citations omitted).[4]

Here, there was no policy regarding lesbian relationships. In fact, at least one of the coaches and other members of the softball team were gay. Newell testified in her deposition that she had not made efforts to find out about other players' relationships and had never informed any other parents of who their children were dating. The results of the interrogation were not disclosed only to a limited class of school personnel who had a need to know, but were instead turned over to S.W.'s mother.

The Fourth Amendment claim involves the coaches' locking S.W. in the locker room and confronting her - not the invasion of privacy under the Fourteenth Amendment which involved the disclosure of her sexual orientation to her mother. Therefore, the majority incorrectly finds that the district court overlooked case law. Further, the majority finds that verbal abuse does not give rise to a constitutional violation under 42 U.S.C. § 1983, and, "thus, there is simply no clearly established constitutional right." Again,

---

[4] The Court further addressed the provision of the drug testing policy that required students to identify prescription medications in advance if they wanted to avoid sanctions for a false positive drug test.

the majority errs. The case cited by the majority, *Calhoun v. Hargrove*, 312 F.3d 730, 734 (5th Cir. 2002), for the proposition that verbal abuse does not give rise to a constitutional violation under 42 U.S.C. § 1983 actually says:

> A claim for relief under § 1983 must allege the deprivation of a right secured by the Constitution or the laws of the United States by a defendant acting under color of state law. *Wong v. Stripling*, 881 F.2d 200, 202 (5th Cir.1989). Furthermore, under 42 U.S.C. § 1997e(e), "[n]o federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."

*Calhoun*, 312 F.3d at 734.

This is not a suit by a prisoner and there is no applicable federal statute requiring physical injury. Notwithstanding the inapplicability of *Calhoun*[5], verbal abuse is only one of the actions cited by Wyatt. The others included locking S.W. in the locker room, interrogating her, intimidating gestures, etc. Under the same authority as the Fourteenth Amendment analysis above, there clearly exists a Fourth Amendment right against unreasonable seizure/false imprisonment. The majority ignores the balancing test which is required to determine whether the State's interest outweighs

---

[5] Notably, while dismissing as uncontrolling the abundant authority from other circuits that supports Wyatt's position, the majority attempts to also rely on *Doe v. Gooden*, 214 F.3d 952, 955 (8th Cir. 2000), and *Walker-Serrano by Walker v. Leonard*, 168 F.Supp.2d 332, 347 (M.D. Pa. 2001), for its proposition that verbal abuse does not give rise to a constitutional violation. In *Gooden*, the Eighth Circuit found that the teacher's statements did not amount to a constitutional violation, but did not foreclose the possibility of such, saying: "Verbal abuse is normally not a constitutional violation." 214 F.3d at 955. In *Walker*, the Pennsylvania district court cited *Gooden* for the proposition that "verbal abuse, whether coming from a student or a teacher, is not a constitutional violation." *Walker*, 168 F.Supp.2d at 348. However, *Gooden* does not say that. *Gooden*, 214 F.3d at 955. Further, *Walker* was a First Amendment case involving an elementary student's petition against a school field trip to a circus. The plaintiff also claimed emotional distress for teasing from other students after she and her mother boycotted the field trip and protested outside the circus. Importantly, the district court repeatedly indicated that elementary students do not enjoy the same clearly established rights as high school students.

No. 11-41359

S.W.'s right against unreasonable seizure. Instead, the majority presumably finds that such a right does not clearly exist for high school students and, thus, there is no need to determine objective reasonableness. I disagree. As stated previously, school children do not shed their constitutional rights at the schoolhouse gate. The majority fails to cite any authority to indicate that the Fourth Amendment right to be free from unreasonable seizure does not extend to high school students. A consideration of the objectively reasonable prong is necessary.

For the same reasons stated in the Fourteenth Amendment right to privacy discussion, I would conclude that there are genuine issues of material fact and that summary judgment was correctly denied.

## Conclusion

Accordingly, I would find that Wyatt has alleged clearly established constitutional rights and that there are genuine issues of material fact sufficient to warrant denial of summary judgment on the basis of qualified immunity. Because I would affirm the district court, I respectfully dissent.